CHOTEAU *v.* BURNET, COMMISSIONER OF INTERNAL REVENUE.

No. 81. Argued January 28, 29, 1931.—Decided May 25, 1931.

*Mr. T. J. Leahy,* with whom *Messrs. C. S. Macdonald, James H. Maxey, F. W. Files,* and *Louis N. Stivers* were on the brief, for petitioner.

*Assistant Attorney General Youngquist,* with whom *Solicitor General Thacher* and *Messrs. Claude R. Branch, Sewall Key* and *A. H. Conner,* Special Assistants to the Attorney General, *Clarence M. Charest,* General Counsel, Bureau of Internal Revenue, and *Ellis W. Manning,* Special Attorney, were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The petitioner is a member of the Osage tribe of Indians, duly enrolled as such under the Act of June 28, 1906,[1] and holds a certificate of competency issued March 5, 1910, pursuant to that Act. He owns his own original allotment of the tribal lands, and has inherited from a deceased member a one-half interest in the latter's allotment, but nothing in this case turns on his ownership of these lands. He also owns his own original share in the tribal revenues, and, by inheritance from a deceased member, one-half of the interest in those revenues to which that member would be entitled if living.

In the years 1918, 1919 and 1920 petitioner's entire income was received from these one and one-half shares in the tribal income from oil and gas leases made by the tribe under the authority of the Act. The leases were on a portion of the lands bought by the United States with money belonging to the tribe, thereafter held in trust for it, and subsequently allotted to its members as directed by the Act. But in the division or allotment of the tribal lands the oil, gas and other minerals therein were expressly reserved to the tribe for a period of twenty-

---

[1] c. 3572, 34 Stat. 539.

five years,[2] now extended to April 8, 1958.[3] Provision was made for the leasing of such minerals by the tribal council, with the approval of the Secretary of the Interior,[4] and the income from such leases is to be placed in the Treasury of the United States to the credit of the members of the tribe and distributed among them quarterly.[5] This was the source of the petitioner's income.

The petitioner paid income taxes in each of the years mentioned. Upon the receipt of a deficiency letter from the Commissioner of Internal Revenue he instituted a proceeding before the Board of Tax Appeals in which he claimed that he owed no deficiencies, but was entitled to a refund of the amounts theretofore paid because he was exempt from income tax on the sums received. The Board's decision was for respondent,[6] and was affirmed by the Circuit Court of Appeals.[7] This court granted certiorari.[8]

The petitioner urges several arguments in support of the claim that he is not liable for tax under the Revenue Act of 1918. These may conveniently be grouped into two main contentions: First, that the statute evidences no intent to tax petitioner on such income, and second, that if its language is broad enough to cover his case, his status, or the nature of the income, requires a holding that he is exempt.

The language of §§ 210 and 211 (a)[9] subjects the income of " every individual " to tax. Section 213 (a)[10]

---

[2] § 3, Act of 1906, *supra.*

[3] 45 Stat. 1478.

[4] § 3, Act of 1906, *supra.*

[5] § 4, First and Second, and § 6, Act of 1906, *supra.*

[6] 14 B. T. A. 1254.

[7] 38 F. (2d) 976.

[8] 281 U. S. 714.

[9] 40 Stat. 1062.

[10] 40 Stat. 1065.

includes income " from any source whatever." The intent of Congress was to levy the tax with respect to all residents of the United States and upon all sorts of income. The act does not expressly exempt the sort of income here involved, nor a person having petitioner's status respecting such income, and we are not referred to any other statute which does.

But it is said that as to the income here taxed petitioner is exempt because of his status as an Indian. This assertion requires a reference to the policy of the government with respect to the Indians. No provision in any of the treaties referred to by counsel has any bearing upon the question of the liability of an individual Indian to pay tax upon income derived by him from his own property. The course of legislation discloses that the plan of the government has been gradually to emancipate the Indian from his former status as a ward; to prepare him for complete independence by education and the gradual release of his property to his own individual management. This plan has included imposing upon him both the responsibilities and the privileges of the owner of property, including the duty to pay taxes.[11] Pursuant to this policy the Act of 1906 directed the allotment to each member of the Osage tribe of a homestead of 160 acres to be chosen by him, which was to be inalienable and nontaxable for twenty-five years or during the life of the allottee. After setting apart such homestead to each, the surplus lands were all to be equally divided and allotted amongst the members. Section 2, Seventh, of the Act provides that the Secretary of the Interior, after due investigation, may issue certificates of competency to members of the tribe. It declares that " upon the issuance of such certificate of competency

[11] See *United States* v. *Nice*, 241 U. S. 591, 598; *United States* v. *Waller*, 243 U. S. 452, 459; *McCurdy* v. *United States*, 246 U. S. 263, 269; *Shaw* v. *Oil Corp.*, 276 U. S. 575, 579.

the lands of such member (except his or her homestead) shall become subject to taxation, and such member (with exceptions not here material) shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States." [12]   Since 1910, when he received his certificate, petitioner has therefore been taxable upon his allotted lands, except his homestead, and they have been freely alienable.

There are provisions in the Act of 1906 with respect to the holding, payment and administration of the royalty shares of members who do not have certificates of competency, but with these we are not concerned. The shares of royalty of those holding such certificates are to be paid to them quarterly.

The petitioner, then, was competent to hold and make any use (except to grant mining leases) of all his lands. All except his homestead were taxable, and were freely alienable without control or supervision of the government. His share of the royalties from oil and gas leases was payable to him, without restriction upon his use of the funds so paid.   It is evident that as respects his property other than his homestead his status is not different from that of any citizen of the United States.   In the process of gradually changing the relation between the Indian and the government he has been, with respect to the income in question, fully emancipated.   (Compare *United States* v. *Waller, supra.*)   It is true, as petitioner

---

[12] Section 4 of the Act of February 27, 1925, c. 359, 43 Stat. 1008, authorizes the revocation of a certificate held by one of more than one-half Indian blood, if the Secretary of the Interior shall find that the holder is squandering or misusing his or her funds.   The revocation is not to affect the legality of any transactions theretofore made by reason of the issuance of a certificate, and all debts existing at the time of revocation are to be paid by the Secretary or his representative out of the income of the member.   This section has no bearing upon the present case.

asserts, that as to his homestead he still remains a restricted Indian. But this fact is only significant as evidencing the contrast between his qualified power of disposition of that property and his untrammeled ownership of the income in controversy. The latter was clearly beyond the control of the United States. The duty to pay it into petitioner's hands, and his power to use it after it was so paid, were absolute. *Work* v. *Mosier*, 261 U. S. 352; *Work* v. *Lynn*, 266 U. S. 161. The claim that with respect to this income the petitioner was restricted, and therefore exempt from the tax laid by §§ 210 and 211 (a) must fail.

It remains to consider whether there is anything in the nature of the income itself making it necessary to exempt it from the broad language of the Revenue Act. It is suggested by petitioner that the sums received were gifts and not income. In view of the facts above recited this argument is without substance. It is further insisted that since the royalties are not taxable, so long as they remain in the hands of the government in trust for the tribe and undistributed to members, income derived by the individual member from this fund comes from an exempt source and must therefore also be held to be exempt. (See *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429; 158 U. S. 601.) Royalties received by the government from mineral leases of Indian lands have been held to be beyond a State's taxing power (*Gillespie* v. *Oklahoma*, 257 U. S. 501; *Shaw* v. *Oil Corp.*, 276 U. S. 575) on the ground that, while in the possession of the United States they are a federal instrumentality, to be used to carry out a governmental purpose. It does not follow, however, that they cannot be subjected to a federal tax. The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter. *Heiner* v. *Colonial Trust Co.*, 275 U. S. 232; *Shaw*

v. *Oil Corp., supra.* But whatever may have been the liability of the fund to federal taxation while it remained in the hands of the government, it cannot properly be said that the share of it paid as royalties to the petitioner constituted in his hands an instrumentality of the government and was therefore beyond the scope of the tax. (Compare *McCurdy* v. *United States,* 246 U. S. 263.) There is, therefore, nothing in the nature of the income which excepts it from the effect of § 213 (a) of the Revenue Act of 1918.

*Affirmed.*