*Decision will be entered for the respondent.*

BENTLEY L. HOLT AND BONNIE J. HOLT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 86329, 93475. Filed July 30, 1965.

*William Howard Payne*, for the petitioners.
*Donald W. Wolf*, for the respondent.

ARUNDELL,* *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1956, 1957, and 1958 in the amounts of $630.01, $786.38, and $1,204.57, respectively. Subsequently, all issues pertaining to 1956 and 1957 and all but one issue relating to 1958 were settled.

### FINDINGS OF FACT

Bentley L. Holt, hereinafter referred to as Bentley or petitioner, and Bonnie J. Holt were husband and wife, residing near Isabel, S. Dak., in 1958. They filed a joint Federal income tax return for that year on the cash basis method of accounting with the district director of internal revenue for the district including South Dakota.

Bentley is of Indian blood and descent. He is a duly enrolled,[1] allotted,[2] and recognized member of the Cheyenne River Tribe of Sioux Indians, hereinafter referred to as tribe. He has been designated Allottee No. 3704 on the Cheyenne River Reservation in South

---

*This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. This case, not having been disposed of, was reassigned to Judge C. R. Arundell on May 21, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented within 30 days. No such requests were received and the case was taken under advisement by Judge Arundell.

[1] "Enrolled" means that petitioner is listed on the tribal roll as a member of the Cheyenne River Tribe.

[2] This term indicates that he has been allotted in severalty certain tribal lands which are being held in trust for his benefit by the United States. At the end of the term of such trust, he will receive a patent in fee for those lands.

Dakota and is classified as a noncompetent[3] ward[4] of the Federal Government.

The constitution of the tribe contains the following provisions:

### ARTICLE VIII—LAND

Sec. 1. *Allotted lands.*—Allotted lands, including heirship lands, within the Cheyenne River Reservation shall continue to be held as heretofore by their present owners. It is recognized that under existing law such lands may be condemned for public purposes, such as roads, public buildings, or other public improvements, upon payment of adequate compensation, by any agency of the State of South Dakota or of the Federal Government, or by the tribe itself. It is further recognized that under existing law such lands may be inherited by the heirs of the present owner, whether or not they are members of the Cheyenne River Sioux Tribe. Likewise it is recognized that under existing law the Secretary of the Interior may, in his discretion, remove restrictions upon such land, upon application by the Indian owner, whereupon the land will become subject to State taxes and may then be mortgaged or sold.

The right of the individual Indian to hold or to part with his land, as under existing law, shall not be abrogated by anything contained in this constitution, but the owner of restricted land may, with the approval of the Secretary of the Interior, voluntarily convey his land to the Cheyenne River Sioux Tribe either in exchange for a money payment or in exchange for an assignment covering the same land or other land, as hereinafter provided.

Sec. 2. *Tribal lands.*—The unallotted lands of the Cheyenne River Reservation and all lands which may hereafter be acquired by the Cheyenne River Sioux Tribe or by the United States in trust for the Cheyenne River Sioux Tribe shall be held as tribal lands, and no part of such land shall be mortgaged or sold. Tribal lands shall not be allotted to individual Indians but may be assigned to members of the Cheyenne River Sioux Tribe, or leased, or otherwise used by the tribe, as hereinafter provided.

Sec. 3. *Leasing of tribal lands.*—Tribal lands may be leased by the tribal council, with the approval of the Secretary of the Interior, for such periods of time as are permitted by law.

In the leasing of tribal lands preference shall be given, first to Indian cooperative associations, and, secondly, to individual Indians who are members of the Cheyenne River Sioux Tribe. No lease of tribal land to a non-member shall be made by the tribal council unless it shall appear that no Indian cooperative association or individual member of the tribe is able and willing to use the land and to pay a reasonable fee for such use.

Grazing permits covering tribal land may be issued by the tribal council, with the approval of the Secretary of the Interior, in the same manner and upon the same terms as leases.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Sec. 6. *Grant of "exchange" assignment.*—Any member of the tribe who owns an allotment or any share of heirship land may voluntarily transfer his interest in such land to the tribe in exchange for any assignment to the same land or other land of equal value. If the assignee prefers, he may receive, in lieu of a specific tract of land, a proportionate share in a larger grazing unit.

---

[3] This term does not denote that Bentley is *non compos mentis*. It simply means, in this situation, that he could not freely alienate certain lands held by him.

[4] This does not refer to a wardship in the common law sense of the term. See Federal Indian Law 557 ff. (Dept. of the Interior 1958).

Assignments made under this section shall be known as "exchange" assignments.

\* \* \* \* \* \* \*

Sec. 10. *Exchange of assignments.*—Assignments may be exchanged between members of the Cheyenne River Sioux Tribe by common consent in such manner as the tribal council shall designate.

Sec. 11. *Use of unassigned tribal land.*—Tribal land which is not assigned, including tribal timber reserves, shall be managed by the tribal council for the benefit of the members of the entire tribe, and any cash income derived from such land shall accrue to the benefit of the tribe as a whole.

During 1958 Bentley derived income from ranching and farming operations on 3,520 acres of land. He had obtained 1,440 of the 3,520 acres as allotted lands pursuant to sections 1, 6, and 10 of article VIII of the tribal constitution. Title to 320 acres was held by Bentley in fee. Title to the remaining 1,760 acres was held in trust by the United States for the benefit of the tribe and this acreage was denoted "tribal lands."

In 1954 Congress passed Pub. L. No. 776. The Act's purpose was to provide—

complete rehabilitation for all members of said Tribe who are residents of the Cheyenne River Sioux Reservation \* \* \* and for relocating and reestablishing members of said Tribe \* \* \* to the extent that the economic, social, religious, and community life of all said Indians shall be restored to a condition not less advantageous \* \* \* than the condition that the said Indians now are in: *Provided,* That said fund provided for in this section shall be expended upon the order and direction of the Tribal Council of said Tribe, \* \* \* [68 Stat. 1192 (1954).]

On February 6, 1956, the Commissioner of the Bureau of Indian Affairs, pursuant to authority delegated by the foregoing Act, approved the tribe's rehabilitation plan, hereinafter called the plan.

One aspect of this plan was the "repayment cattle program." Under this program, land, bulls, yearling heifers, and production materials were furnished by the tribe to its members interested in ranching, and they subsequently repaid the grants in the form of cattle and cash. Title to all cattle furnished to the member pursuant to the program remained in the tribe until full payment therefor. The cattle could be sold only with the permission of the tribe's governing body.

Pursuant to said plan, on September 24, 1956, Bentley and Bonnie applied for a rehabilitation loan of $10,000. The application incorporated the program's terms previously mentioned. They concurrently executed a note for $10,000 payable to the governing body of the tribe, the tribal council, and, to secure payment thereof, a mortgage on the 1,440 acres of allotted land. Finally, they executed an "Assignment of Trust Property and Power to Lease," providing in part:

In consideration of the granting of a loan to the undersigned under the terms of loan agreement No. 182, the undersigned hereby assigns to the lender as security for repayment of such loan, the following: (a) All property, except land,

which is now or may in the future be held in trust for the undersigned by the United States; (b) all income from trust land in which the undersigned now has or may in the future acquire an interest; (c) any income from any source and any funds from any source accruing to the individual Indian account of the undersigned. [Also] Any income received from lands held in trust by the United States Government or any income received from sales of personal property.

The undersigned hereby grants to the superintendent of the agency under which the lender is operating, full right, power and authority to demand, collect, sue, or receipt for any property and income of the undersigned, and to apply such income on the indebtedness of the undersigned to the lender. If payment is not made as set forth in the loan agreement of the undersigned, said superintendent or his authorized agent may take possession of any trust property or income of the undersigned, and dispose of the same in accordance with instructions of the Commissioner of Indian Affairs, and apply the proceeds on said indebtedness.

The loan application was approved on October 10, 1956, and the security agreement was approved on October 22 of that year. The proceeds of the loan were deposited in a bank account maintained jointly by petitioner and the tribe's "Rehab" (apparently the tribe's rehabilitation council that administered the plan), and proceeds from the disposition of the cattle in 1958 were deposited in the account.

On December 1, 1956, Bentley obtained from the tribe a "Grazing Permit" on "Range Unit No. 124." This unit included the 1,760 acres of tribal land. The permit, in part, provided:

By authority of law and under the regulations (25 CFR 71) prescribed by the Secretary of the Interior, Bentley L. Holt * * * is hereby granted permission to hold and graze livestock on the foregoing range unit * * * for a period beginning December 1, 1956, and terminating not later than November 30, 1959, including all unreserved tribal land as authorized by the governing body of the said Tribe and all unfenced Indian allotments on which authority to grant grazing privileges have been obtained and Government-owned lands which are part of the unit * * *

* * * * * * *

In consideration of the above privileges the permittee agrees to pay to the Superintendent for the use and benefit of the Indians entitled to occupy the lands above described, the sum of money found to be due from the permittee * * * and the permittee further agrees to pay the grazing fees annually in advance. * * *

This permit shall not be assigned, sublet, or transferred without the written consent of the parties * * *

Bentley deposited with the superintendent an amount equal to one-half of the annual grazing fee as a penal bond "to guarantee full performance under the terms of the permit."

In 1958 petitioner realized $4,452.64 from transactions in cattle raised on the 1,760 acres of tribal land.

### OPINION

The only issue remaining for decision is whether income derived by a tribal Indian through his use of tribal lands held in trust by the

United States is exempt from Federal income taxation. Respondent has characterized the question as one of first impression, and our research has substantiated that characterization.

We begin with the proposition that exemptions from taxation must be clearly expressed. As the Supreme Court stated in *Choteau* v. *Burnet*, 283 U.S. 691, 694, 696 (1931), a case involving taxability of income of an Osage Indian:

> The intent of Congress was to levy the tax with respect to all residents of the United States and upon all sorts of income. The act does not expressly exempt the sort of income here involved, nor a person having petitioner's status respecting such income, and we are not referred to any other statute which does.
>
> \* \* \* \* \* \* \*
>
> The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter. \* \* \*

*Superintendent* v. *Commissioner*, 295 U.S. 418 (1935).

Pursuant to the principle enunciated in *Choteau* v. *Burnet, supra*, we have examined the relevant treaties and Acts of Congress, but we have found no language therein to support petitioner's claim of exemption.[5] Furthermore, the recent case of *Commissioner* v. *Walker*, 326 F. 2d 261 (C.A. 9, 1964), reversing in part 37 T.C. 962 (1962), while factually dissimilar, is strong support for our conclusion that Bentley is taxable on the income at issue.

The taxpayer in *Walker* was a noncompetent Indian serving as tribal treasurer. For such work he was compensated by the tribe with income derived from its tribal lands. We held such income exempt from taxation. The Ninth Circuit Court of Appeals reversed, holding Walker taxable on the ground that there was neither treaty nor Act of Congress exempting such income from taxation.

In neither *Walker* nor the instant case did the taxpayer receive the income in question as his derivative, pro rata share of tribal income. In each case the income was produced solely for his benefit, not for the benefit of the tribe. Under such a circumstance, the absence of any statute or treaty providing exemption requires taxation. *Commissioner* v. *Walker, supra* at 264.

Notwithstanding the absence of any statute or treaty supporting his claim to exemption, petitioner contends that *Squire* v. *Capoeman*, 351 U.S. 1 (1956), holds that an Indian's income from both allotted and tribal lands is exempt from Federal taxation. He further argues that the funds appropriated by Congress for the rehabilitation plan

---

[5] Petitioner states in his reply brief: "It is conceded that there is perhaps no treaty nor Act of Congress that says in bold terms 'Income derived by an Indian from Tribal land leased by such Indian is not subject to Federal income tax.'"

were impressed with a trust and exempt from taxation. Thus, he reasons, the sale of cattle originally acquired with such funds resulted in the income produced by the sale being tax exempt. Finally, he contends that Bentley, as a tribal member, has a pro rata ownership interest in the tribal lands and, since the tribe is not taxed on income produced from the lands, he cannot be taxed.

In *Capoeman*, the taxpayer had been allotted land from the tribal reservation pursuant to an Act of Congress. That Act provided that the United States would hold the land in trust for 25 years, at which time a patent in fee would be issued to Capoeman "free of all charge or incumbrance whatsoever." It was also provided that all restrictions on taxation of the allotted land would end on such issuance. Prior to issuance of the fee, the Bureau of Indian Affairs sold, for the taxpayer's benefit, timber from the lands and the collector of internal revenue assessed against Capoeman a tax based on the gain from the sale. The District Court and the Court of Appeals held the gain exempt from taxation, and the collector appealed.

The Supreme Court first observed (351 U.S. at 6) that—

Indians are citizens and * * * in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens. We also agree that, to be valid, exemptions to tax laws should be clearly expressed.

The Court then held that the previously cited provisions of the Act evidenced Congress' intent to exempt the taxpayer's income from the allotted lands from all taxation, in order that such lands might be preserved intact for the allottee when he received the patent therefor in fee.

Since *Capoeman* involved only allotted lands,[6] the Supreme Court did not have to answer the question now before this Court. Petitioner, however, points to the following language in the opinion as indicating that the Court also intended to settle the question before us (351 U.S. at 8–9):

it was said by Felix S. Cohen, an acknowledged expert in Indian law, that "It is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom."[15] [Citing Cohen, Handbook of Federal Indian Law 265 (1942).] These relatively contemporaneous * * * writings are *entitled to consideration.* [Emphasis added. Footnote omitted.]

The cited language does not warrant petitioner's conclusion. The Court made clear earlier in its opinion that, absent exemption by

---

[6] In *Jones* v. *Taunah,* 186 F. 2d 445 (C.A. 10, 1951), the Tenth Circuit held both oil and gas rentals and income from agricultural activities and leases on allotted land were not exempt from taxation. In affirming the Ninth Circuit's decision in *Capoeman,* the Supreme Court noted the "apparent conflict" between the two circuits.

treaty or remedial legislation, an Indian is subject to the income tax. As we have noted, petitioner concedes that there is no treaty or statute exempting the income involved herein. We have concluded that the cited language and the authorities cited by Cohen in support thereof do not warrant disregard for the Court's prerequisite to tax exemption.

Two of those three authorities, *United States* v. *Homeratha*, 40 F. 2d 305 (W.D. Okla. 1930), appeal dismissed 49 F. 2d 1086 (C.A. 10, 1931), and *Pitman* v. *Commissioner*, 64 F. 2d 740 (C.A. 10, 1933), reversing 24 B.T.A. 244 (1931), involved allotted lands and statutes, similar to those in *Capoeman*, exempting the lands from taxation until a patent in fee was issued. Thus, exemption of income from the allotted land was justified by the statute.

The third case, *Blackbird* v. *Commissioner*, 38 F. 2d 976 (C.A. 10, 1930), reversing 14 B.T.A. 1247 (1929), admittedly offers, on its face, stronger support for petitioner's contention. It held that income derived by a noncompetent Indian from tribal lands is exempt from taxation, even in the absence of any provision of statute or treaty authorizing exemption. However, we note that the Supreme Court, in *Superintendent* v. *Commissioner*, *supra* at 419–420, expressly disapproved this principle. Thus, the petitioner can find little support in *Blackbird* for his contention.

While it is true that petitioner assigned his income from the lands to secure payment of a loan obtained under the rehabilitation plan, the presence of such a security interest in the tribe is insufficient to hold that it "derived directly" the income within the meaning of *Capoeman*, *supra*. This is not a situation in which Bentley was only a conduit through which income flowed toward its tribal destination. The receipts were income only to Bentley, not the tribe.

Petitioner next contends that the purpose and nature of the rehabilitation plan requires tax exemption for any income derived in the process of its operation. He points to the facts that cattle raised under the plan cannot be sold without the tribe's permission and the proceeds from the sales must be deposited in an account maintained jointly by Bentley and the tribe. He further argues that retention of title by the tribe until repayment of loans made under the program, combined with the Federal Government's part in the program, impresses income derived therefrom with a trust and requires its exemption from tax. Finally, he argues that Congress provided no funds under the program for tax liabilities and reduction of the Indians' profit by the imposition of taxes would frustrate the program's purpose. He cites the cases of *United States* v. *Rickert*, 188

U.S. 432 (1903), and *Dewey County, S.D.* v. *United States,* 26 F. 2d 434 (C.A. 8, 1928), in support of his position.

The crux of petitioner's argument is that income derived from the utilization of the loan must be preserved intact until such time as he becomes competent and independent. The difficulty with his position, however, is that Congress did not see fit to express any intention of exempting from taxation income derived through operation of the plan because of the fact that it was so derived. Under such a circumstance the principle enunciated by *Choteau* v. *Burnet, supra* at 696, is particularly applicable. "The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter."

The authorities cited by petitioner are inapposite. Each involved taxes levied by a State on personalty issued to Indians by the United States, not on income therefrom. Furthermore, they held only that, since the property was an instrumentality of the Federal Government, *State* taxation thereof was forbidden. Neither case stands for the proposition that Federal taxation of such income is forbidden. As *Dewey County* pointed out: "The jurisdiction of the United States * * * was exclusive and the levies made under the claimed authority and power of the State were void." (26 F. 2d at 435.)

Finally, we note that Congress expressly considered tax problems in other parts of Pub. L. No. 776. Section 11 provides that the United States shall purchase land within or without the reservation's boundaries for tribal members whose lands have been condemned, pursuant to the law, for a flood control project. It further states: "*Provided,* That no purchase of lands outside the Cheyenne River Reservation shall affect the existing status of such lands * * * with respect to *taxation.*" (68 Stat. 1191, 1193 (1954). Emphasis added.) Having so spoken with respect to one section of the Act, it seems clear that Congress would have similarly spoken in other sections if such had been its intention.

Petitioner's final thrust goes to the nature of his interest in the tribal lands in question. He claims that, as a tribal member, he is a coowner of the lands. Therefore, since he had leased his own lands on which no patent in fee has been issued, the income therefrom is tax exempt. He cites no authorities in support of his argument and we can find none.

*Decisions will be entered under Rule 50.*