BRYAN L. STEVENS AND BRYAN L. STEVENS AS SURVIVING SPOUSE OF ALMA STEVENS, DECEASED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4719–62.   Filed May 27, 1969.

*Stephen Granat,* for the petitioner.
*James E. Merritt* and *Ernest J. Wright,* for the respondent.

OPINION

Scott, *Judge:* Respondent determined deficiencies in petitioner's income taxes for the calendar years 1958 and 1959 in the amounts of $4,098.49 and $2,365.60, respectively. By amended answer filed February 26, 1965, respondent claimed increased deficiencies in the amounts of $177.74 and $86.65 for the calendar years 1958 and 1959, respectively, making the total deficiencies in controversy $4,276.23 and $2,452.25 for these years.

The issue for decision is whether there should be included in the taxable income of an incompetent Indian income from ranching operations on lands of an Indian reservation acquired by him partially by allotment, partially by gift, partially by purchase, partially by lease, and partially by being granted a grazing permit.

All of the facts have been stipulated and are found accordingly.

Bryan L. Stevens and Alma Stevens were during the years 1958 and 1959 husband and wife, residing in Dodson, Mont. They filed joint Federal income tax returns for the calendar years 1958 and 1959 with the district director of internal revenue at Helena, Mont.

Bryan L. Stevens, who is also known as Benjamin L. Stevens, is a one-quarter blood Gros Ventre Indian and is an enrolled Indian with the Fort Belknap Indian Reservation, Harlem, Mont. His allotment number is 556 and his residence on the date the petition in this case was filed was Dodson, Mont. Petitioner's wife, Alma Stevens, was a white person. On October 5, 1962, the District Court in Phillips County, Mont., entered an order authorizing petitioner and Alma to live separate and apart from each other. Alma died intestate on April 17, 1965, while residing in California. Under California law her heirs were petitioner, her surviving spouse, and her daughter by a prior marriage.

During the years 1958 and 1959 petitioner was engaged in ranching and farming operations consisting primarily of raising and selling beef cattle on 20,547.14 acres of land located on the Fort Belknap Indian Reservation. All of his income during these years was derived from these farming and ranching operations. Petitioner had acquired in various ways the land used in his farming and ranching operations as hereinafter detailed.

On May 26, 1941, petitioner was allotted two parcels of land. One which contained approximately 308.83 acres was allotted to him as a homestead under the Act of March 3, 1921 (41 Stat. 1355). The other allotment made to petitioner on May 26, 1941, was also made under the Act of March 3, 1921. This allotment consisted of a parcel containing approximately 210.64 acres. Both allotments were by "trust

patents" given to petitioner by the United States which contained among others the following provision:

Now Know Ye, That the UNITED STATES OF AMERICA, in consideration of the premises, has allotted, and by these presents does allot, unto the said Indian the Land above described, and hereby declares that it does and will hold the Land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian and at the expiration of said period the United States will convey the same by patent to said Indian in fee, discharged of said trust and free from all charge and incumbrance whatsoever; but in the event said Indian dies before the expiration of said trust period, the Secretary of the Interior shall ascertain the legal heirs of said Indian and either issue to them in their names a patent in fee for said Land, or cause said Land to be sold for the benefit of said heirs as provided by law; and there is reserved from the lands hereby allotted, a right of way thereon for ditches or canals constructed by the authority of the United States.

On December 19, 1947, petitioner purchased with $725.18 of his own funds a parcel of land containing approximately 362.59 acres from Joseph Shawl (Fort Belknap allottee No. 1161) and Melda Black Hoop Shawl. Title to the property was taken in the name of the United States of America in trust for petitioner as an allottee of Fort Belknap. The deed issued to petitioner was on a U.S. Department of the Interior, Office of Indian Affairs, form and was designated, "Deed Noncompetent Indian Lands." The deed recited that it was made by and between Joseph Shawl with his allotment number and Melda Black Hoop Shawl, his wife, "noncompetent Fort Belknap Indian," parties of the first part, and the United States of America in trust for petitioner, party of the second part. Following the description of the land, there was a statement made in the deed with respect to reservation of mineral rights to the tribe and reservation for rights-of-way for ditches or canals constructed by the authority of the United States. The deed further provided that a lien for repayment of irrigation charges, if any, as to the lands above described "is reserved to the United States as required by the Act of March 3, 1921 (41 Stat. 1355)." There followed the statement, "This conveyance is made in accordance with the Act of June 18, 1934 (48 Stat. 984)." The warranty portion of the deed contained the covenant that "they will forever warrant and defend the said premises against the claim of all persons, claiming or to claim by, through, or under them only." The deed was approved on behalf of the Secretary of the Interior.

On June 1, 1948, petitioner purchased a parcel of land containing approximately 332.40 acres from the Regional Director of the Bureau of Indian Affairs for $747.80. This purchase likewise was made with petitioner's personal funds. This parcel of land was allotted to James

Shawl who died on April 29, 1945. Title to the land purchased by petitioner was taken in the name of the United States of America in trust for petitioner. The order transferring this land was entitled, "Order Transferring Inherited Interests in Indian Land to an Indian." It provided after recitations with respect to a determination of the best interests of the heirs of the deceased Indian being served by selling the land and that one or more of the heirs were noncompetent Indians, that in accordance with the authority conferred upon the regional director "all right, title, interest, claim or demand of any nature whatsoever of the heirs of the above-named allottee in and to the lands" is transferred to the United States of America in trust for petitioner, giving petitioner's allotment number "for use and disposition as other trust allotments on the said reservation. This conveyance so made is subject to all valid existing rights-of-way and liens for repayment of irrigation charges and to reservations in the trust patent, if any."

On June 30, 1950, petitioner purchased with $900 of his own funds a parcel of land containing approximately 360 acres from Edward Phares (Fort Belknap allottee No. 460). At the time of the sale the property was held in trust by the United States of America for Edward Phares. Title to the property purchased by petitioner was taken in the name of the United States of America in trust for petitioner. The deed transferring this property was on the Department of the Interior form of deed to restricted Indian land and this deed contained substantially the same provision as did the deed whereby petitioner acquired land from Joseph Shawl.

On August 16, 1951, petitioner acquired approximately 360 acres of land from Lillian Adams Werle (Fort Belknap allottee No. 492) and Lewis H. Werle in consideration for the exchange of the parcel of land which petitioner had acquired by the deed dated June 30, 1950, from Edward Phares. This deed was likewise on the Department of the Interior form which was used for deeds to restricted Indian land and contained approximately the same provisions as did the other two deeds petitioner had received upon the purchase from allottees of lands that had been allotted to and held by the United States in trust for noncompetent Indians. The property which petitioner acquired was taken in the name of the United States of America in trust for petitioner, a noncompetent Indian of the Fort Belknap Reservation.

On October 22, 1951, petitioner acquired by gift parcels of land containing approximately 39.40, 68.21, 11.18, and 44.48 acres, respectively. The gift was from petitioner's mother, Rosalie Stevens No. 1 (Fort Belknap allottee No. 552). The deed to these lands was on the same form of deed to restricted Indian land as the deeds to the lands purchased by petitioner, and except for the deed reciting that the consider-

ation was "One Dollar, Love and Affection," it was substantially in the form and wording as those deeds. This deed referred to a first lien existing for the repayment of irrigation charges, if any, as required by the Act of March 3, 1921 (41 Stat. 1355), in language slightly different from that in the other deeds. The title to this land was taken in the name of the United States of America in trust for petitioner with his allotment number being shown on the deed.

On October 22, 1951, by a second deed which read in all respects as the other deed of that date except for the land descriptions, petitioner acquired by gift from his mother, Rosalie Stevens No. 1 (Fort Belknap allottee No. 552), two parcels of land containing approximately 198.84 and 160 acres. Title to these parcels was also taken in the name of the United States of America in trust for petitioner with his allotment number designated.

The parcels of land which petitioner purchased from Joseph Shawl, Edward Phares, the Werles, and the Regional Director of Indian Affairs on behalf of the heirs of James Shawl had been received by the individuals as allotments under trust patents, each of which trust patents contained the precise provision with respect to the United States of America holding the property for the Indian as that which we quoted from the trust patents under which petitioner received his two allotments on May 26, 1941.

During the years 1958 and 1959 petitioner had a grazing permit for cattle ranching for 15,628.02 acres of land with the Fort Belknap Consolidated Indian Agency. The land under grazing permit to petitioner in 1958 and 1959 included 12,394.75 acres owned by individual Indians enrolled with the Fort Belknap Consolidated Indian Agency, title to which lands was held in the name of the United States of America in trust for the individual Indian, 2,317.39 acres of unallotted land owned by the Gros Ventre Tribe, and 915.88 acres designated as "on & off" State land. "On & off" lands are lands which had been set aside to the State of Montana for school use under the Act of March 3, 1921. There was attached to petitioner's grazing permit a "Certificate of On-and-Off Lands," certifying that petitioner would use the land for grazing the same livestock authorized to be grazed under his grazing permit for the individual and tribal Indian lands.

On October 19, 1935, the Fort Belknap Indian Community which consisted of the Gros Ventre and the Assinniboine tribes accepted the Indian Reorganization Act of June 18, 1934 (48 Stat. 984). The Fort Belknap Indian Community adopted a constitution and bylaws and a corporate charter. There were amendments from time to time of the constitution and bylaws. However, at all times these documents contained approximately the same provisions with respect to community

lands and leasing of community lands as the provision contained in the original which, insofar as here pertinent, was as follows:

Sec. 2. *Community lands.*—The unallotted lands of the Fort Belknap Reservation, and all lands which may hereafter be acquired by the Fort Belknap Community, shall be held as community lands and shall not be allotted to individual Indians but may be assigned to members of the Fort Belknap Community, or leased, or otherwise used by the community as hereinafter provided.

Sec. 3. *Leasing of community lands.*—Community lands may be leased by the community council, with the approval of the Secretary of the Interior, for such periods of time as are permitted by law.

In the leasing of community lands preference shall be given, first, to Indian cattle associations, and, secondly, to individual Indians who are members of the Fort Belknap Community. No lease of community land to a nonmember shall be made by the community council unless it shall appear that no Indian cattle association or individual member of the community is able and willing to use the land and to pay a reasonable fee for such use.

Grazing permits covering community land may be issued by the community council, with the approval of the Secretary of the Interior, in the same manner and upon the same terms as leases.

Free grazing privileges covering not to exceed 30 head of cattle or an equivalent amount of other livestock, may be assigned on community grazing land by the community council, to members of the community who do not have any grazing lands.

During the years 1958 and 1959 petitioner paid an annual rental of $2,947.95 to the Indian Agency for the grazing permit, which rental payment was distributed by the Agency to the individual enrolled Indian owners and to the tribe.

During 1958 and 1959 petitioner used 2,490.15 acres of land located on the Fort Belknap Indian Reservation which were owned by 11 individual noncompetent Indians who were allottees of land on the Fort Belknap Indian Reservation and who were relatives of petitioner. Petitioner used these lands under oral leases and he paid no direct compensation to his relatives for the use of the lands, but he did run cattle owned by these individual relatives of his on such land. Petitioner received the hay which he could harvest from those lands. All of the lands operated by petitioner pursuant to the informal or verbal leases with his relatives were lands which were either originally allotted to the individual relative of petitioner or purchased by them. Title to all of these lands was in the name of the United States of America in trust for the individual Indians. The "trust patent" making the original allotment of these lands contained the provision contained in the "trust patents" issued to petitioner on May 26, 1941, heretofore quoted.

The beneficial owner-seller of land held in trust initiates all transactions regarding the alienation or encumbering of that land by sub-

mitting a prescribed form to the Indian Agency requesting approval of the proposed transaction.

Petitioner did not maintain a trust fund account with the Indian Agency. He managed his ranch and his farming operations without supervision by that Agency, deposited the receipts from his ranching and farming operations in his personal bank account, and drew checks in payment of the expenses of these operations on his personal bank account. Petitioner sold cattle, sheep, and other ranch and farm products on his own volition without obtaining approval or supervision of the Indian Agency. He likewise purchased supplies, equipment, and other items for use in his farming and ranching operations on his own volition without obtaining approval or supervision of the Indian Agency. However, any transaction regarding the alienation of or placing an encumbrance upon land held by the United States in trust for petitioner required the approval of the Indian Agency.

Petitioner was born in July 1896 and has resided on the Fort Belknap Indian Reservation all his life. He has carried on ranching operations on range unit 30 for approximately 27 years. Petitioner had hay-cutting permits for 332.40 acres of land held in trust by the United States for individual enrolled Indians or held by the Fort Belknap Indian Agency in trust for the tribe.

Petitioner did not request that he be declared competent or that title to the lands held in trust for him by the United States be conveyed to him in fee. There were no requirements that petitioner make such request and the option was with petitioner to make such request if he chose to do so. In the opinion of the superintendent of the Fort Belknap Reservation during the years 1958 and 1959 petitioner had adequately demonstrated his ability to manage his own affairs without Bureau supervision and the superintendent of the Fort Belknap Reservation knew of no situation where petitioner's competence in these respects had been questioned.

The Federal income tax returns filed by petitioner and Alma Stevens for the calendar years 1958 and 1959 showed adjusted gross income of $13,013.01 and $12,534.08, respectively. Petitioner computed self-employment tax with respect to his income of $141.75 and $180 for the years 1958 and 1959, respectively. He paid the amount of self-employment tax so computed. However, no other income tax was shown as due with respect to petitioner's reported income. Attached to each of the returns was a statement that petitioner was "a ward of the government, being an enrolled Indian at the Fort Belknap Indian Agency, Harlem, Montana" and that "Pursuant to the following notation of ruling made, taxpayer claims his income as exempt from federal income taxes: * * *." The ruling to which petitioner

referred and from which he quoted was Rev. Rul. 56–342. 1956–2 C.B. 20.

Respondent in his notice of deficiency made certain adjustments in depreciation on cattle, cost of cattle sold, and capital gains as shown by petitioner on his income tax returns for the years 1958 and 1959, thus increasing petitioner's adjusted gross income as shown on his returns for the years to $19,582.45 and $13,988.78, respectively. These adjustments were placed in issue in the petition but have apparently been abandoned by petitioner since no evidence was introduced with respect thereto and no argument has been made by petitioner in his brief with respect thereto. Respondent in his notice of deficiency determined that except for $819.13 in 1958 and $522.18 in 1959, all of petitioner's income was taxable income. In explaining this adjustment, respondent stated:

It is held that the income derived from 494.74 acres of land allotted to you and 358.84 acres of land received by gift from Rosalie Stevens, No. 1, #552, a total of 853.58 acres of the 20,365.98 acres of land controlled by you is exempt from Federal income tax as it is derived from allotted and restricted Indian lands held in trust by you for the United States. The amount of the exemption is determined to be 853.58/20,365.98 of the total income as adjusted, derived from agricultural pursuits.

Respondent in his amended answer alleged that only 308.83/20,365.98 of petitioner's income for the years 1958 and 1959 is exempt from Federal income tax.

Petitioner contends that he is exempt from Federal income tax on all his income derived from farming because he is an enrolled Gros Ventre Indian living on the Fort Belknap Indian Reservation and is a noncompetent ward of the Government. Petitioner points out that his activities are conducted almost entirely on the Fort Belknap Reservation and his livelihood is made from agricultural operations conducted on lands which are held in trust by the United States for him or other noncompetent Indians of the Fort Belknap Reservation or Indian tribal lands.

Petitioner relies on the decision of the Supreme Court in *Squire* v. *Capoeman*, 351 U.S. 1 (1956). In that case the taxpayers' lands had been granted to them under the provisions of the General Allotment Act of 1887 (24 Stat. 388). The Supreme Court held that the provision in that Act requiring conveyance of the lands to the allottees in fee after 25 years "free from all charge or incumbrance" and the similar provision in the "trust patents" issued to the allottees resulted in the income from the sale of timber from the allotted lands held in trust by the United States for the Indian allottees being not subject to Federal income tax. Petitioner contends that *Squire* v. *Capoeman*, *supra*, should be interpreted to hold that no income received by a non-

competent enrolled Indian from farming operations on lands on an Indian reservation is subject to Federal income tax. Petitioner also directs attention to a number of rulings of respondent dealing with the application of *Squire* v. *Capoeman, supra.*

Respondent in making the determination set forth in his notice of deficiency in the instant case apparently considered that under the holding in *Squire* v. *Capoeman, supra,* petitioner's income derived from ranching activities on his homestead land, the land which he received by direct allotment from the United States, and the land he acquired by gift from his mother is not subject to Federal income tax.[1] However, in his amendment to answer, respondent alleges that only petitioner's income derived from ranching activities on his homestead land is not subject to Federal income tax under the holding of *Squire* v. *Capoeman, supra.*

Respondent argues that because of differences in the provisions of the Act of March 3, 1921, under which petitioner received his allotment, and the General Allotment Act of 1887, 25 U.S.C. sec. 331, involved in *Squire* v. *Capoeman,* the opinion of the Supreme Court in *Squire* v. *Capoeman,* is not applicable to income from any of petitioner's land except his homestead land. It might be here noted that respondent in substance concedes that to the extent any of petitioner's land is considered to be subject to the provision that it be transferred to the allottee by the United States "free from all charge and incumbrance whatsoever," the holding in *Squire* v. *Capoeman,* applies to petitioner's income from cattle raising the same as to a taxpayer's income from timber sales involved in *Squire* v. *Capoeman.*

Respondent in his Rev. Rul. 56–342, 1956–2 C.B. 20, held that income held in trust for or received by the patent holder which is derived directly from allotted and restricted Indian land while such lands are held by the United States as trustee, in accordance with section 5 of the General Allotment Act of 1887, will not be subject to Federal income tax. This ruling further stated that such exempt income includes rentals, royalties, proceeds from sales, natural resources, income from sale of crops grown upon the land, and from use of the land for grazing purposes.[2] Rev. Rul. 56–342 has been modified, extended, and

---

[1] The stipulated total of such acreage is 1,041.58 instead of the 853.58 acres used in the notice of deficiency.

[2] Rev. Rul. 56–342, 1956–2 C.B. 20:

"Income held in trust for or received by the patent holder which is derived directly from allotted and restricted Indian lands while such lands are held by the United States, as trustee, in accordance with section 5 of the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. 348, is exempt from Federal income tax. *Squire* v. *Horton Capoeman et ux.,* 351 U.S. 1, Ct. D. 1796, C.B. 1956–1, 605. Such exempt income includes rentals (including crop rentals), royalties, proceeds of sales of the natural resources of such land, and income from the sale of crops grown upon the land and from the use of the land for grazing purposes. Such income is not includible in computing net earnings from self-employment for the purposes of the tax imposed by the Self-Employment Contributions Act of 1954 (chapter 2, subtitle A, Internal Revenue Code of 1954)."

amended from time to time by respondent. In Rev. Rul. 62–16, 1962–1 C.B. 7, respondent ruled that the proceeds from the sale or exchange of cattle and other livestock raised by an Indian on his allotted and restricted lands while such lands are held for him by the United States as trustee in accordance with section 5 of the General Allotment Act of 1887 are exempt from income tax. Respondent in this ruling discussed his previous rulings and concluded:

Accordingly, it is held that income held in trust for or received by an Indian from the sale or exchange of cattle and other livestock raised on his allotted and restricted Indian lands while such lands are held in trust for him by the United States, as trustee, in accordance with section 5 of the General Allotment Act is exempt from Federal income tax. Unless otherwise provided by law, the exemption described herein will not be applicable in those instances where the Indian has obtained his interest in the exempt lands through an arm's length purchase rather than, for example, through allotment, gift, devise, or inheritance.

Were the issue presented to us whether the income received from the sale or exchange of cattle is so directly related to the lands on which the cattle are raised as to cause that income to be comparable to the income from the sale of timber discussed in *Squire* v. *Capoeman, supra,* we would consider it a close and difficult issue. The parties do not present this issue to us. Petitioner takes the position that all his income is exempt as heretofore stated, and respondent concedes, apparently because of his revenue ruling as quoted in part above, that petitioner's income from grazing cattle is the same type of income as the income from the sale of timber involved in *Squire* v. *Capoeman.* The only issue presented deals with whether the lands used by petitioner for grazing cattle should be considered to be comparable to lands received by a noncompetent Indian by an allotment under the General Allotment Act of 1887. We therefore do not pass on the question of whether income from raising cattle should be treated as income from the sale of timber on land but confine our determination to the issue presented to us. Also, petitioner has not questioned respondent's allocation of income on the basis of acreage if we conclude that part of his income is taxable and part is not taxable.

We have heretofore considered the question of whether the holding of the Supreme Court in *Squire* v. *Capoeman, supra,* required the conclusion that all income of so-called noncompetent Indians is relieved from Federal income tax. In *Bentley L. Holt,* 44 T.C. 686 (1965), affd. 364 F. 2d 38 (C.A. 8, 1966), certiorari denied 386 U.S. 931, we held that a noncompetent Indian ward of the Federal Government who raised cattle on tribal lands used by him by authority of a grazing permit issued by the tribe was taxable on the income received from that activity. In *Bentley L. Holt, supra,* we stated with respect to

## 340

the income of a noncompetent Indian being subject to Federal income tax as follows (44 T.C. at 690) :

We begin with the proposition that exemptions from taxation must be clearly expressed. As the Supreme Court stated in *Choteau* v. *Burnet*, 283 U.S. 691, 694, 696 (1931), a case involving taxability of income of an Osage Indian:

"The intent of Congress was to levy the tax with respect to all residents of the United States and upon all sorts of income. The act does not expressly exempt the sort of income here involved, nor a person having petitioner's status respecting such income, and we are not referred to any other statute which does.

*  *  *  *  *  *  *

"The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter. * * *"

*Superintendent* v. *Commissioner*, 295 U.S. 418 (1935).

Pursuant to the principle enunciated in *Choteau* v. *Burnet, supra*, we have examined the relevant treaties and Acts of Congress, but we have found no language therein to support petitioner's claim of exemption. Furthermore, the recent case of *Commissioner* v. *Walker*, 326 F. 2d 261 (C.A. 9, 1964), reversing in part 37 T.C. 962 (1962), while factually dissimilar, is strong support for our conclusion that Bentley is taxable on the income at issue. [Footnote omitted[5].]

The taxpayer in *Walker* was a noncompetent Indian serving as tribal treasurer. For such work he was compensated by the tribe with income derived from its tribal lands. We held such income exempt from taxation. The Ninth Circuit Court of Appeals reversed, holding Walker taxable on the ground that there was neither treaty nor Act of Congress exempting such income from taxation.

In the instant case we likewise hold that petitioner is not exempt from tax simply because of being a noncompetent Indian ward of the United States. Also on the authority of *Bentley L. Holt, supra*, we hold that petitioner is taxable on the income derived from grazing cattle on the tribal land he used under a grazing permit. The provision in the tribal constitution and bylaws with respect to preference being given Indians in issuing grazing permits on tribal lands of the tribe granting the grazing permit to the taxpayer in the *Holt* case was approximately the same as that of the tribe granting the grazing permit to petitioner in the instant case. There is no substantial distinction in *Bentley L. Holt* and the instant case insofar as the income derived from raising cattle on tribal lands held under a grazing permit is involved. On the authority of that case we hold for respondent in this case as to petitioner's income from raising of livestock on tribal lands held by him under a grazing permit. In our view there is no distinction between income earned from farming operations on land used under a grazing permit from other individual Indians and income from tribal lands used under a grazing permit. The amount paid to the United States as trustee for the allottees from whom petitioner obtained grazing rights might be considered not to be includable in the

taxable income of the allottee whose land was under permit to petitioner if the land were considered to be subject to the same provisions as the land involved in *Squire* v. *Capoeman, supra.* However, petitioner as the grantee is merely acquiring grazing rights for the purpose of ranching operations. There is no reason to distinguish the income derived from ranching operations on tribal lands on which petitioner had a grazing permit and lands held under a grazing permit from individual Indians. Therefore, on the authority of *Bentley L. Holt, supra,* we hold that income allocable to all the lands held by petitioner under grazing permits is subject to Federal income tax.

The Court of Appeals in *Holt* v. *Commissioner,* 364 F. 2d 38 (C.A. 8, 1966), in affirming 44 T.C. 686 (1965), pointed out that in addition to the income from ranching activities on the tribal land, which the taxpayer in that case held under grazing permits, there was income allocable to lands owned by that taxpayer in fee and to land specifically allotted to the taxpayer pursuant to Federal law and tribal constitutions. The court pointed out that the taxpayer conceded liability for the income or profits derived from his fee title land and the Government conceded upon the basis of *Squire* v. *Capoeman, supra,* that income from the allotted land is exempt from tax. In the instant case respondent takes the position that petitioner's income from ranching activities on his allotted land is not exempt from tax since there was no specific provision in the Act of March 3, 1921, since which he received his allotment stating that within 25 years or such period as might be extended by the President, the Indian was to obtain his allotted land "in fee discharged of said trust and free of all charge or incumbrance whatsoever" such as was contained in the General Allotment Act of 1887.[3] It is true that the Act of March 3, 1921, did not make such a specific reference. However, that Act specifically referred to the Secretary of the Interior as being "authorized and directed to allot pro rata under rules and regulations and in such area and classes of land as may be prescribed by him among such enrolled Indians all the unreserved and otherwise undisposed of lands on the Fort Belknap Reservation, which trust patents shall be issued in the name of the said

---

[3] General Allotment Act of 1887, 24 Stat. 388. 25 U.S.C. sec. 331

Sec. 5. That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall ,be of the legal effect, and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period. * * *

allottees * * *." [4] The reference to trust patents in the Act of March 3, 1921, and the fact that a provision in the Act of May 1, 1888 (25 Stat. 113), with respect to allotments from other lands to Gros Ventre Indians who had settled on lands being ceded to the United States was identical to the provisions in the General Allotment Act of 1887 with respect to the land being transferred to the Indians in fee after 25 years discharged of all encumbrances, make it clear that allotments under the Act of March 3, 1921, were to have the same guarantees as allotments under the General Allotment Act of 1887 except insofar as the Act of March 3, 1921, specifically provided to the contrary. One of the provisions to the contrary was with respect to liens in favor of the United States for repayment of certain costs in certain instances where Indians obtained irrigated lands or irrigation rights. Respondent argues that this provision in the Act of March 3, 1921, shows that the land was not to be transferred free of all encumbrances whatsoever as was the land under the General Allotment Act of 1887. That respondent's interpretation is incorrect is shown from the fact that the patents contained a provision that after 25 years the land would be transferred free and clear of all encumbrances. .

The Supreme Court in *Squire* v. *Capoeman, supra*, did not rely only on the provision in the General Allotment Act of 1887 with respect to the transfer of the land free of encumbrances but also specifically relied on the provision of the "trust patent." In footnote 6 (351 U.S. at 4), the Supreme Court quoted the provision of the trust patent al-

---

[4] 41 Stat. 1355. Chap. 135.—An Act Providing for the allotment of lands within the Fort Belknap Indian Reservation, Montana, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That within one year from the date of approval of this Act the Secretary of the Interior shall appoint a commission of three persons, two of whom shall be members of the Gros Ventre and Assinniboine Tribes of Indians. and one member an employee of the Interior Department, who shall cause to be prepared, in such manner as they may deem advisable, a complete and final roll, to contain the names of all Indians ascertained to have rights on the Fort Belknap Reservation, Montana. Immediately upon the approval of the said roll which shall be the conclusive and final evidence of the right of any Indian of the reservation to an allotment of land, the Secretary of the Interior is hereby authorized and directed to allot pro rata, under rules and regulations and in such areas and classes of lands as may be prescribed by him, among such enrolled Indians all the unreserved and otherwise undisposed-of lands on the Fort Belknap Reservation, which trust patents shall be issued in the names of the said allottees: *Provided further,* That any names found to be on the said roll fraudulently may be stricken therefrom by the Commissioner of Indian Affairs, with the approval of the Secretary of the Interior, at any time within one year from the approval thereof, after giving all persons interested a full opportunity to be heard; and the fraudulent allotment shall be canceled and the lands thereof be subject to disposal under the provisions of this Act: *And provided further,* That the land allotted hereunder shall be subject to any tribal leases existing at the date of approval of the said allotments.

Notwithstanding the death of any person duly enrolled as herein provided, allotment shall be made in his or her name as though living, the land embraced in such allotment to pass by descent to the legal heirs of the decedent and to be subject to disposition as in the case of lands of other allottees passing upon their death.

lotting land to the taxpayer in that case, which provision is substantially the same as the provisions contained in the trust patents here involved. In *Squire* v. *Capoeman*, the Court referred to the Government's promise to transfer the fee free of all charge or encumbrance and at page 10 specifically stated, in referring to the basis of the exemption of income from the land, that it was "guaranteed by the tax exemption afforded by the General Allotment Act, and the solemn undertaking in the patent." The undertaking of the United States in the patent was as much a part of the basis for the Supreme Court's decision as the provision of the General Allotment Act. We therefore conclude that the direct allotments to the petitioner-allottee in the instant case were subject to the same assurance by the United States as those involved in *Squire* v. *Capoeman*, *supra*, and therefore income applicable to lands allotted by the United States to petitioner, as well as income from the homestead land allotted to him, is exempt from Federal income tax.

Respondent considers in his rulings that income from allotment or homestead lands which are received by an Indian by inheritance or gift is to be treated in the same manner as such income would be treated in the hands of the devisor or donor. Since respondent here does not argue to the contrary, the only issue presented to us with respect to the land received by petitioner by gift from his mother is whether income she might have received from the land had she farmed such land herself would have been exempt from income tax. We do not consider it proper in a case of this type to pass on an issue not presented. Since the land petitioner received by gift from his mother was land allotted to her by a trust patent providing that the land would be transferred to her after 25 years free of any charge or encumbrance whatsoever, we hold that the income from farming the land would be exempt from her taxable income. In line with respondent's position we hold that since her income from farming the land would be exempt from Federal income tax, so is petitioner's income from farming the land, including, as does respondent, ranching activities.

In our view the income from farming the land which petitioner used under informal leases with his relatives and the 332.40 acres on which he had a hay-cutting permit is taxable to him for the same reasons we set forth in concluding that income from the lands on which petitioner held grazing permits is includable in his taxable income.

The "Order Transferring Inherited Interests in Indian Land to an Indian" under which petitioner obtained his interest in 332.40 acres of land provided that all rights or claims of the heirs of the allottee

of the land is transferred to the United States in trust for petitioner "for use and disposition as other trust allotments on said reservation." When this wording is contrasted with the wording of the deeds of allottees making inter vivos transfers of their allotted lands, it is apparent that petitioner received the same guarantees upon transfer of the inherited land as the original allottee had. Since the transfer to the original allottee was by a trust deed in all respects similar to that transferring petitioner's allotted lands to the United States in trust for him, petitioner had the same rights in the 332.40 acres of land that he would have had if he had been the original allottee. We therefore conclude that this 332.40 acres transferred to the United States as trustee for petitioner by the order transferring inherited lands should be considered to have all the same rights attached to it as were attached to petitioner's allotted lands. We hold that petitioner's income derived from ranching activities on this 332.40 acres of land is exempt from Federal income tax under the holding of *Squire* v. *Capoeman, supra,* and respondent's rulings interpreting that decision.

The final problem is the taxability of income from petitioner's farming operations on the 722.59 acres of land which he purchased from other individual Indians who had been allotted such land under the Act of March 3, 1921. Title to this land was taken in the name of the United States of America as trustee for petitioner, the transfer being made in accordance with the Act of June 18, 1934 (48 Stat. 984, 25 U.S.C. sec. 468). There is no provision in the document or deed transferring the land from the original allottee to petitioner as a purchaser with title taken by the United States as his trustee guaranteeing transfer of the land by the United States to the purchaser free of encumbrance. Had petitioner taken the title in his own name in fee, the issue here involved would not arise because the guarantee to transfer the land to the Indian in fee free of encumbrance could not exist once the fee were transferred to the Indian. We have found no case involving income from lands purchased by a noncompetent Indian with title taken in the United States as trustee, and neither party has directed our attention to any case involving such an issue. The only warranties which the sellers made to petitioner or the United States as trustee for petitioner upon the sale of the land were those contained in the document or deed transferring the property. As heretofore stated this document did not refer to the fee title being at any later date transferred to the purchaser unless such provision is to be considered to be a covenant of the United States to any noncompetent Indian who is an assignee of the original allottee. The conveyance was made in accordance with the Act of June 18, 1934, and therefore any guarantee by the United States to the purchaser for whom the United States

took title as trustee in addition to those appearing on the face of the deed would have to be found in this Act. Section 4 of the Act of June 18, 1934, deals with the limitations on sales, devises, gifts, exchanges or other transfers of "restricted Indian lands, or of shares in the assets of any Indian tribe." [5] This is the only provision in the Act of June 18, 1934, dealing with transfers of land from a noncompetent Indian. There is nothing in this provision relative to any guarantee of transfer by the United States of land to the assignee of an original allottee free of encumbrance. We conclude that the guarantee of transfer of the land to the original allottee in fee free of any charge or encumbrance whatsoever is a guarantee by the United States to the individual allottee and not a covenant which would be binding on the United States upon transfer of the fee to an assignee of the original allottee unless specific provision was made for the continuance of the guarantee. Absent a duty by the United States to transfer the purchased land to petitioner free of any "charge and incumbrance whatsoever," the reason given for holding the income from the land involved in *Squire* v. *Capoeman*, *supra*, exempt from Federal income tax is not applicable to the income from the purchased lands in the instant case. As we stated in *Bentley L. Holt*, *supra*, the "intent to exclude [income from Federal income tax] must be definitely expressed." We therefore conclude that the income applicable to the lands purchased from other allottees is includable in petitioner's taxable income.

It appears to us that the result of our conclusions exempts from Federal income tax, the income from only 520.40 more acres of land than the number of acres with respect to which respondent determined the income to be exempt in his notice of deficiency.

The alternative issue raised by respondent with respect to petitioner's computation of self-employment tax would only arise had we

---

[5] Sec. 4 of the Act of June 18, 1934, 48 Stat. 984, reads as follows:

Sec. 4. Except as herein provided, no sale, devise, gift, exchange or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: *Provided, however,* That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located or from which the shares were derived or to a successor corporation; and in all instances such lands or interests shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located or in which the subject matter of the corporation is located, to any member of such tribe or of such corporation or any heirs of such member: *Provided further,* That the Secretary of the Interior may authorize voluntary exchanges of lands of equal value and the voluntary exchange of shares of equal value whenever such exchange, in his judgment, is expedient and beneficial for or compatible with the proper consolidation of Indian lands and for the benefit of cooperative organizations.

determined all or substantially all of petitioner's income to be exempt from Federal income tax. We therefore do not reach respondent's alternative issue.

*Decision will be entered under Rule 50.*