Hayes BIG EAGLE (1), Ruby Bolton (2), and Charles Whitehorn (3)

v.

The UNITED STATES.

No. 158–59.

United States Court of Claims.
March 7, 1962.
Rehearing Denied May 9, 1962.

---

John W. Cragun, Washington, D. C., for plaintiffs.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith and Eugene Emerson, Washington, D. C., were on the brief.

PER CURIAM.

This case was referred pursuant to Rule 45, 28 U.S.C. to Trial Commissioner Marion T. Bennett, with directions to make findings of fact and recommenda-tions for conclusions of law. The com-missioner has done so in a report filed July 27, 1961. Plaintiffs elected to sub-mit the case on the commissioner's report without brief. Defendant filed its excep-tions to the commissioner's report and brief and the case was submitted to the court on oral argument by counsel for the parties. Since the court is in agree-ment with the findings and recommenda-tions of the trial commissioner, as here-inafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs, therefore, are entitled to recover and judgment, together with in-terest as provided by law, will be entered in favor of plaintiffs Hayes Big Eagle (1) in the sum of $151, Ruby Bolton (2) in the sum of $172.39 and Charles White-horn (3) in the sum of $96.01.

It is so ordered.

■ This is a tax refund case before the court pursuant to its jurisdiction un-der 28 U.S.C. §§ 1346(a) (1) and 1491. The issue is whether royalty income from Osage tribal mineral deposits credited to the individual trust accounts of noncom-petent Osage Indians is exempt from Federal income tax. The essential facts are stipulated.

Prior to the Osage Allotment Act of June 28, 1906, 34 Stat. 539, the Osage reservation was held by the United States in trust for the Osage tribe. By the act, the tribal lands and funds were equally divided among the 2,229 tribal members. The lands were surveyed and allotted di-rectly to individuals and the minerals were evenly divided through the provision for "headrights," which is the term used to describe a right to 1/2229th share of the distributable income from the min-erals, plus a reversionary title to a like share of the minerals whenever the min-eral trust terminates. The act provided that the royalties derived from the ex-traction of the minerals be placed in the United States Treasury and held in trust for a period of 25 years to the credit of the individual members of the tribe, sub-ject to periodic distributions. By statu-tory amendment the trust period has been

extended to 1983 (52 Stat. 1034, section 3). While the trust exists, legal title to the minerals is in the United States as trustee, but thereafter the minerals will vest absolutely in the allottees or their heirs. See section 2(7) and section 5 of the act, supra. These basic arrangements have not been changed in any of the 12 amendments to the act between 1906 and 1957.[1]

At all times material here, the plaintiff taxpayers were adult, fullblood, Osage Indians who have never received certificates of competency. In addition, Big Eagle is under guardianship. Each of the three individuals had inherited an interest in the Osage tribal trust fund as follows: Hayes Big Eagle, 1.47916 mineral headrights; Ruby Bolton, 1.00073 headrights; and Charles Whitehorn, 1.-33333 headrights, of which one was his original headright and the remaining .33333 was inherited. For the calendar year 1953, the plaintiffs received mineral headright income as follows:

| | |
|---|---|
| Hayes Big Eagle | $2,501.85 |
| Ruby Bolton | 1,692.64 |
| Charles Whitehorn | 2,255.20 |

The income listed above was all collected by defendant's duly authorized officers and credited to each petitioner's individual trust account. The funds were not distributed directly to them, for disbursements from the trust accounts could only be made upon application and according to their need as determined by the Secretary of Interior or his authorized representative.

The duly authorized agents of defendant at the Osage Indian Agency prepared Federal income tax returns for each of these plaintiffs covering the year 1953.

The returns were filed on the following dates:

| | |
|---|---|
| Hayes Big Eagle | June 18, 1954 |
| Ruby Bolton | April 12, 1954 |
| Charles Whitehorn | June 10, 1954 |

The defendant by its officers paid itself as Federal income tax for 1953 the following sums: $151 from the trust account of Hayes Big Eagle; $172.39 from the trust account of Ruby Bolton; and $96.01 from the trust account of Charles Whitehorn. These funds were credited to the special tax account and periodically the Osage Agency transferred the accumulated funds in a lump sum to the Internal Revenue Service.

Timely claims for refund were filed on behalf of plaintiffs but denied by the District Director of Internal Revenue, as noted in the findings of fact. This suit followed.

No Federal income tax has heretofore been collected from the mineral right or headright income of noncompetent Osage Indians. Defendant now asserts that such income is taxable for two reasons. Defendant cites the broad provisions of the Internal Revenue Code of 1939 (26 U.S.C. §§ 11(a), 21(a), 22(a)), stating that said provisions impose a tax on the net income of "every individual" derived "from any source whatever." Defendant also says that the Osage Allotment Act, as amended, neither expressly nor impliedly confers tax exempt status on either the taxpayers themselves or on their headright income.

To refute the first defense, plaintiffs rely upon the decision of the U.S. Court of Appeals for the Tenth Circuit in Mary Blackbird v. Commissioner, 10 Cir., 38 F.2d 976, 977 (1930).[2] The case is

---

1. The amendments to the Osage Allotment Act of June 28, 1906, 34 Stat. 539, are as follows:
   Act of 1909 (Feb. 27), 35 Stat. 1167.
   Act of 1912 (April 18), 37 Stat. 86.
   Act of 1918 (May 25), 40 Stat. 561, 578, 579.
   Act of 1921 (March 3), 41 Stat. 1249.
   Act of 1924 (April 12), 43 Stat. 94.
   Act of 1925 (February 27), 43 Stat. 1008.

   Act of 1929 (March 2), 45 Stat. 1478.
   Act of 1938 (June 24), 52 Stat. 1034.
   Act of 1947 (August 4), 61 Stat. 747.
   Act of 1948 (February 5), 62 Stat. 18.
   Act of 1950 (June 15), 64 Stat. 215.
   Act of 1957 (August 28), 71 Stat. 471.

2. Chouteau v. Commissioner, Pettit v. Commissioner and Blackbird v. Commissioner were companion cases in the Tenth Circuit (38 F.2d 976). Chouteau was an

squarely in point. The identical issue was presented as to taxation of income from the mineral-based headrights of a noncompetent Osage Indian. These rights were held in trust by defendant. The court said:

"* * * As to Mary Blackbird, we are disposed to yield our assent to the soundness of the contention. She is a restricted full-blood Osage. Her property is under the supervising control of the United States. She is its ward, and we cannot agree that because the income statute, Act of 1918 (40 Stat. 1057), and Act of 1921 (42 Stat. 227), subjects 'the net income of every individual' to the tax, this is alone sufficient to make the Acts applicable to her. Such holding would be contrary to the almost unbroken policy of Congress in dealing with its Indian wards and their affairs. Whenever they and their interests have been the subject affected by legislation they have been named and their interests specifically dealt with. Elk v. Wilkins, 112 U.S. 94, 100, 5 S.Ct. 41, 44, 28 L.Ed. 643: 'General acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them.' In Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941, the court, after noting the general rule that exemptions from taxation are to be strictly construed, said at page 675 of 224 U.S., 32 S.Ct. 565, 569:

'But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and depend-ent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years, and has been applied in tax cases.'"

The court in Blackbird also cited opinions by the Attorney General to the effect that it had never been the practice to legislate for the Indian generally along with the rest of the people and that legislation, especially revenue laws, should not be applied to Indians unless Congress in clear and unambiguous language so directed. 34 Ops. Att'y Gen. 439; 35 Ops. Att'y Gen. 4, 1107.

Following the Blackbird decision in 1930, the Revenue Service in 1936 again asserted its right to collect a tax under circumstances precluded by decision G. C.M. 16100, XV–1CB80. But, this ruling was revoked when it was realized that the decision in Blackbird constituted an estoppel of judgment. G.C.M. 18242, 1937–1CB57. The third assertion of taxability (G.C.M. 26399, 1950–2CB8) brings this case in issue. Defendant feels that under the rationale of Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, it is no longer collaterally estopped on account of the weakening of the Blackbird doctrine by the next two cases now referred to.

Defendant says that Blackbird's wings have been clipped by the Supreme Court and cites Chouteau v. Burnet, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931). Although the name is spelled differently in the references given, the Indian seems to be the same one involved in the Blackbird case, reference to whom is made in the preceding footnote. The case was before the Supreme Court to review a judgment of the Tenth Circuit Court of Appeals, affirming a decision of the Board of Tax Appeals, Chouteau v. Commissioner, 14 B.T.A. 1254. Chouteau was a competent Indian so certified. The Su-

---

Osage Indian who had received a certificate of competency. Pettit was a white woman who had inherited lands from her children, members of the Osage tribe. Blackbird was a noncompetent Osage, as noted. The Circuit Court upheld the taxability of Chouteau and Pettit. The Supreme Court affirmed Chouteau but did not review Pettit.

preme Court quoted the Revenue Act of 1918 saying that the income of "every individual" is subject to tax "from any source whatever" and went on to say that the act does not expressly exempt the sort of "person having petitioner's status," which was that of a competent Indian, who, since receipt of his certificate of competence, had been taxable. The Court did not mention the Blackbird case nor go into the question of taxability of a noncompetent Indian except to suggest that in the case of Chouteau his income was beyond the control of the United States in the sense that he could use it as he pleased when he got it from the government and that the same was subject to tax when there is no intent definitely expressed by the statute to exempt such income from tax. The decision is clearly bottomed upon the fact that this Indian had achieved emancipation. Blackbird was neither overruled nor modified by Chouteau.

Defendant next points to Superintendent of Five Civilized Tribes v. Commissioner of Internal Revenue, 295 U.S. 418, 55 S.Ct. 820, 822, 79 L.Ed. 1517 (1935). This case involved Sandy Fox, a full-blood Creek Indian, presumably noncompetent. The case was also out of the Tenth Circuit. Certain income derived from a restricted allotment, in excess of the needs of Fox, was invested. It was "income derived from investment of surplus income from land." This reinvestment income was collected and held in trust for Fox by the Secretary of Interior. The question was whether this income was taxable under the 1928 Revenue Act and the answer of the Commissioner, the Board of Tax Appeals, the Court of Appeals and the Supreme Court was affirmative. Sandy Fox relied upon the Blackbird decision. The Supreme Court said that decision was not in harmony with what it said in Chouteau, failing, however, to point out that the former involved a noncompetent Indian whereas Chouteau was competent. The Supreme Court went on to suggest, however, that if there was an exemption it would have to derive from agreements

with the Creeks, or some act of Congress dealing with their affairs, and concluded that no Creek agreement or statute conferred general exemption from taxation except as to homesteads. The Court said: "We find nothing * * * which expresses definite intent to exclude from taxation such income as that here involved * * *. Nor can we conclude that taxation of income from trust funds of an Indian ward is so inconsistent with that relationship that exemption is a necessary implication. Nontaxability and restriction upon alienation are distinct things. Choate v. Trapp, 224 U.S. 665, 673, 32 S.Ct. 565, 56 L.Ed. 941. The taxpayer here is a citizen of the United States, and wardship with limited power over his property does not, without more, render him immune from the common burden."

From the foregoing it can be seen that tax exemption as claimed in the instant case cannot at this point safely rest on the restricted status of the taxpayers or upon their headrights alone. We turn then to the statutes dealing with Osage affairs.

In 1906 the Osage reservation was located in Indian territory (Oklahoma) and contained about a million and a half acres of land, much of the same underlaid with petroleum, natural gas, coal and other valuable minerals. At that time the United States held for the tribe a trust fund of $8,373,658.54 received under various treaties as compensation for relinquishing other lands. The annual income of the tribe was nearly one million dollars. Congress concluded that the enjoyment of wealth without responsibility was demoralizing to the Osages and decided upon the policy of gradual emancipation. The Osage Allotment Act of June 28, 1906, 34 Stat. 539, resulted. McCurdy v. United States, 246 U.S. 263, 38 S.Ct. 289, 62 L.Ed. 706. This act was briefly referred to at the beginning of this opinion. The act contained many provisions but few related to taxation and none, of course, to the Federal income tax which did not exist at the time. Section 2 of the act permitted each Osage to

select three 160-acre tracts, one to be designated as a homestead, which was to be "inalienable and nontaxable until otherwise provided by Act of Congress." The other tracts were nontaxable for 3 years. Section 2(7) authorized the Secretary of Interior to issue a certificate of competency to any Indian qualified for it and such an Indian could sell any of his lands "except his homestead, which [was] inalienable and nontaxable for a period of twenty-five years or during the life of the homestead allottee." The certificate rendered the land of the holder, except the homestead, subject to taxation. It has been previously noted how the oil, gas and other minerals were "reserved to the use of the tribe" for a period in trust. Thereafter the minerals held in trust by the United States were to become the "absolute property of the individual members of the Osage tribe, * * * or their heirs," and the moneys and rights in trust would be distributed.

The amendment in 1912, 37 Stat. 86, section 7, provided that lands of Osage Indians not holding a certificate of competency should not be sold to secure any kind of debt, that no lands or moneys inherited from Osage allottees shall be sold to secure any debt of the heir incurred prior to the time such money or lands were turned over to him, but that nothing in the act exempted such property from liability for taxes.

The amendment of 1918, 40 Stat. 561, permitted Osage allottees to change their homestead designation to an equal area of their unencumbered surplus lands but said that each such tract after the change should take the status of the other as it existed prior to the change in designation "as to alienation, taxation or otherwise * * *."

The amendment of 1921, 41 Stat. 1249, reiterated that homestead allotments were not taxable if held by the original allottee prior to April 8, 1931, and gave the Superintendent of the Osage Agency authority to invest certain funds in United States bonds "after paying all taxes of such members * * *."

The act declared all members of the Osage tribe to be citizens of the United States.

Subsequent acts in 1925, 43 Stat. 1008, and in 1938, 52 Stat. 1034, authorized the Secretary of Interior to pay certain funds, including interest on trust funds, bonus from sale of oil or gas leases and royalties, to competent and noncompetent Osages after paying their taxes. No specific reference is made in any of this legislation subsequent to 1906 to Federal income taxes nor does the legislative history suggest any intent to make such taxes applicable to the headright income of noncompetent Osages.

■■ In determining whether Congress expressed an intent in the Osage Allotment Act of 1906 to exempt a noncompetent Indian from Federal income tax on royalties received from mineral deposits held in trust by defendant, or laid down a policy which would exclude such income tax, it is necessary to assess the weight to be given to two principles difficult to reconcile. The first of these, as laid down by the decisions, is that tax exemptions must be clearly expressed and cannot be granted by implication. The second principle is that statutes affecting Indians must be liberally construed, with all doubtful expressions being resolved in their favor. The case coming closest to resolving the principles and disposing of the instant matter is the fairly recent one of Squire, Collector of Internal Revenue of Capoeman, et ux., 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). The Capoeman case arose under the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq., and not under the Osage Allotment Act of 1906. There are certain similarities and differences, however, pertinent to an understanding and applicability of Capoeman to the pending case.

In Capoeman the issue presented was whether the proceeds of the sale by the United States Government of standing timber on allotted lands on the Quinaielt Indian Reservation could be made subject to a capital gains tax consistently with applicable treaty and statutory provisions

and the Government's role as trustee and guardian. The Court said no. Capoeman and wife were fullblood, noncompetent Quinaielt Indians in Washington State. Under the General Allotment Act and by treaty Capoeman was allotted land and the fee therefor was held in trust for him by the United States. In 1943 timber was sold from the land by the Bureau of Indian Affairs, and the proceeds paid to the Government on behalf of the Indian who was required by the Collector to pay a capital gains tax thereon. Claim for refund was denied. Both the district and Court of Appeals ordered a refund. D.C., 110 F.Supp. 924; 9 Cir., 220 F.2d 349.

The Government advanced the arguments that as citizens of the United States the Capoemans were liable under the broad provisions of the Internal Revenue Code of 1939 imposing a tax on the net income of every individual, derived from any source whatever and that there was no exemption to the contrary set forth in any legislation which would benefit these taxpayers.

The lower courts had held that the income was tax exempt by virtue of section 5 of the General Allotment Act, 25 U.S. C.A. § 348 providing that the Indians were to receive the allotted lands (after 25 years) together with a patent "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." On this the Supreme Court referred to the accepted procedure of resolving doubtful expressions in favor of weak and defenseless people who are wards of the Government, dependent upon its protection and good faith, and said that while the phrase quoted above was not expressly couched in terms of nontaxability it might be sufficient to include taxation. However, the Court based its decision on section 6 of the act, as amended, 25 U.S.C.A. § 349, which provided that the Secretary of Interior could, when satisfied that an Indian was competent, issue a patent in fee simple to him and "thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the

satisfaction of any debt contracted prior to the issuing of such patent * * *." The Court went on to say, after quoting the passage above:

"The Government argues that this amendment was directed solely at permitting state and local taxation after a transfer in fee, but there is no indication in the legislative history of the amendment that it was to be so limited. The fact that this amendment antedated the federal income tax by 10 years also seems irrelevant. The literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee. This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted."

The Supreme Court referred with approval to an opinion of the Attorney General, relied upon by the Court in Blackbird, 34 Ops. Att'y Gen. 439, to Treasury decisions and contemporary but unofficial authorities, taking the position that the exemption accorded noncompetent Indians extends to income from their lands and that it cannot be assumed Congress intends to tax a ward for benefit of his guardian. The Court distinguished Superintendent of Five Civilized Tribes, supra, as a case dealing with reinvestment income and not with the allotment system which was devised to protect the interest of the Indians and to prepare them to take their place as independent members of modern society. As such the allotments merited the protection of the Court as to both the trust and income therefrom until such status could be achieved. Such trust and income, it was suggested, would assist in this objective of emancipation.

Defendant urges that Capoeman does not help plaintiffs here, although it says that doubtful expressions in statutes pertaining to Indians should be resolved in their favor. Defendant says that the Osage Allotment Act has no such lan-

guage as the General Allotment Act which did not include the Osage Indians and which act was relied upon by the Supreme Court. This may be the letter but not the spirit of Capoeman which, like Blackbird, holds that the language of the Federal income tax law, broad as it is, does not extend to trust land income of noncompetent Indians even though there is no "definitely expressed" exemption in the tax law. As Justice Murphy said in Oklahoma Tax Commission v. United States, 319 U.S. 598, 623, 63 S.Ct. 1284, 1296, 87 L.Ed. 1612:

"* * * It is immaterial that the legislative history of the Act is silent with regard to the tax status of Indian funds. We are dealing not with a word, nor with an act, but with a course of history. * * *"

Of course, the Capoeman case arose in the context of the General Allotment Act instead of the Osage Allotment Act but the taxing statute, where the exemption supposedly must be clearly expressed, was the same in both cases and subjects to tax "the net income of every individual from any source[s] whatever." And, the purposes of the two allotment acts are generally similar so that it cannot be argued with any persuasion that silence as to the income tax means taxability in one but not in the other. As to the Osage Allotment Act, it must be noted that after income taxes were instituted, Congress had opportunity, when dealing with Osage legislation in 1918, 1921, 1924, 1925, 1929, 1938, 1947, 1948, 1950 and 1957, to say that income from noncompetent Osage headrights was subject to income tax and, thus, had opportunity to modify the 1930 decision in Blackbird. Congress was silent. In view of the firmly established policy for over 100 years of favorable construction of statutes where Indians are involved, especially tax statutes, Congress was on notice that if it intended any change in the law it should speak.

Congress did speak in the 1929 and 1938 amendments, 45 Stat. 1478, section 1, and 52 Stat. 1034, section 3, when it directed that:

"* * * * all royalties and bonuses arising therefrom [the Osage mineral lands] * * * shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law, * * *." (Emphasis added.)

This comes very close to the language of section 5 of the General Allotment Act:

"* * * in fee, discharged of said trust and free of all charge or incumbrance whatsoever."

It is also close to the provision of section 6, supra, saying that, after the Secretary of Interior declares an Indian competent, all restrictions as to sale, incumbrance and taxation of his lands are removed.

The differences are largely semantic. But, the obligation of the trustee is the same—that is, to transfer at the end of the trust or declaration of competency, the lands and cash received for oil and gas undiminished by any deductions levied thereon by the guardian or trustee. If the General Allotment Act implied nontaxability when it directed that trust property be turned over to the Indian after the trust period free of ALL charges, etc., certainly the implication is just the same in the Osage Allotment Act decreeing that ALL royalties and bonuses shall be turned over. If Federal income taxes are first withheld, ALL will not be turned over to the plaintiffs.

The Osage Allotment Act and the General Allotment Act have other devices in common. They speak of the relationship to the property in question as in trust. They prohibit the sale of mineral rights. They prohibit indebtedness of trust property or the subjecting of it to lien, levy, attachment or forced sale. They make competency the determinative factor in fixing the extent to which an individual Indian shall have control over his property. Parallel congressional purposes are apparent but the basic purpose is the one alluded to in Capoeman and that is to protect the property so that it will adequately serve the needs of the ward and finally bring him to a state of competency

and independence. This chance is encouraged, if not guaranteed, by tax exemption. Since 1906 Congress has habitually defined those situations in which there should be no tax exemption for Indians. It has not at any time said that income from noncompetent Osage headrights should be subject to Federal income tax. If this is what it wanted it has had a clear opportunity on several occasions to say so since Blackbird in 1930. Its silence is conclusive. It follows that plaintiffs are entitled to recover.