**Lloyd PATTERSON and Charlene Patterson, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 73–2728.

United States Court of Appeals, Ninth Circuit.

Jan. 27, 1975.

Charles H. Creason, Creason & Creason (argued), Rupert, Idaho, for petitioners-appellants.

George G. Wolf (argued), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WRIGHT and GOODWIN, Circuit Judges, and MILLER,* Judge, U. S. Court of Customs and Patent Appeals.

* Honorable Jack R. Miller, Judge United States Court of Customs and Patent Appeals, sitting by designation.

**49**

## OPINION

MILLER, Judge:

This is an appeal by the taxpayers, husband and wife, from a decision of the United States Tax Court (TC Memo 1973–39) determining a deficiency in income tax for calendar year 1969 for which they filed a joint return on the cash basis. As pointed out by the Tax Court, the only issue between the parties is whether appellants constructively received in 1969 an $18,000 payment which was actually received on January 5, 1970.

The Pattersons were residents of Idaho, where Lloyd Patterson (hereinafter "Patterson") engaged in farming. On June 17, 1969, he entered into a "Potato Growing Agreement" and a "Modification-Agreement" with J. R. Simplot Company for services on his land consisting of growing, harvesting, and storing potatoes, with compensation to be based on quantity and quality of the potatoes grown and stored. Key provisions of the "Modification-Agreement" are as follows:

*Section VI as modified:*

a. Grower shall at his expense plant said seed on the described real property and shall cultivate, irrigate, harvest and in every respect care for said crop in a proper farmer-like manner and shall deliver to his own storage facilities field run at his expense, the potato crop resulting therefrom as herein provided. . . .

b. Grower shall maintain storage temperature suitable for keeping potatoes for processing, ie 40° F. or above.

c. Grower assumes all risk of loss, depreciation, or damage to potatoes from any cause until removal from storage by Company and Grower shall insure potatoes against loss or damage from fire or other casualty while in storage, with a loss payable clause in favor of the Company to reimburse Company for all advances made by Company to Grower.

d. The Company shall accept delivery of and move potatoes field run from storage at its own expense and at Company option from November 1, 1969, to May 31, 1970.

*Section VII as modified:*

a. There shall be deducted from the sum to be paid to the Grower hereunder an amount equal to the cost of services, seed, material and cash advanced by the Company . . . . The balance remaining shall be paid to the Grower one-half at the time of harvest, one fourth at Grower's option, December 31, 1969 or January 5, 1970 and the balance by March 15, 1970 or when potatoes are delivered whichever is later.

.    .    .    .    .

c. Any payment made to the Grower before potatoes are moved from storage shall be based on the estimated total payment to be made hereunder to the Grower by the Company as computed by the Company.

The potato crop governed by the aforesaid agreements was harvested during the fall of 1969 and was stored in Patterson's storage facilities. Delivery of the potatoes occurred as follows:

| Date | Pounds Delivered | Price * |
|---|---|---|
| 2–19–70 | 3,061.0 | $ 6,105.28 |
| 2–20–70 | 6,756.2 | 12,821.97 |
| 2–21–70 | 2,917.4 | 5,440.69 |
| | 12,734.6 | $24,367.94 |

Payments for the above were received by Patterson from the Company as follows:

| Date | Amount |
|---|---|
| 11–7–69 | $ 1,500.00 ** |
| 1–5–70 | 18,000.00 |
| 3–6–70 | 4,867.94 |
| | $24,367.94 |

On January 3, 1970, Patterson requested a payment of $18,000, and almost immediately thereafter the Company's field manager (Rasmussen) made the estimate provided by Section VII c. as modified, set forth above, using merely a tape measurement and visual inspection of the stored potatoes. However, before the check for $18,000 could be issued, Patterson insured the stored potatoes for $27,000 through SAFECO Insurance Company, with a loss payable clause in favor of J. R. Simplot Company. The policy was for ninety days and was dated January 5, 1970. It is apparent that this action was in pursuance of Section VI c. of the "Modification-Agreement," quoted above and that such action was a condition precedent to the $18,000 payment. Indeed, appellee so recognizes it in its brief, stating:

"The facts are that Rasmussen told taxpayer on January 3, 1970, that the insurance must be purchased before the $18,-000 could be paid . . . ."

Among the Tax Court's findings of fact is the following:

All petitioners needed to do to receive payment was to request inspection and payment in December 1969.

In view of the clear requirement in the "Modification-Agreement" that the potatoes be insured by the Grower, with a loss payable clause in favor of the Company to reimburse it for all advances made to Patterson, coupled with the absence of any evidence showing a practice on the part of the company of waiving the requirement, we have a definite and firm conviction that this finding constituted a mistake by the Tax Court. See United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); Grace Bros. v. Commissioner, 173 F.2d 170, 174 (9th Cir. 1949).

The Tax Court cited Treas. Reg. § 1.451–2, T.D. 6723, 29 F.R. 5342 (1964), which sets forth Treasury's interpretation of the doctrine of constructive receipt, as follows:

---

* Includes payments for storage provided by the "Modification-Agreement."

** The $1,500 appears to have been paid to cover harvesting expenses.

(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

. . .

It is appellee's position that Patterson had the clear and unrestricted right to receive payment of three-fourths of the estimated contract proceeds, i. e. $18,000, in 1969 and that his failure to reduce these proceeds to his possession was due solely to his own volition, citing, as did the Tax Court, Romine v. Commissioner, 25 T.C. 859 (1956). We do not find this case apposite, however, inasmuch as all the taxpayer there needed to do was *collect* his money from the sale of livestock in December; also the purchaser had entered the purchase on its books for that month.

Nor do we find the "volition" argument persuasive. After all, a cash basis grain farmer, for example, has it within his "volition" to sell his harvested grain before the end of the year rather than in a subsequent year. However, the doctrine of constructive receipt cannot be stretched to force him to report the proceeds in the year of harvest. The Internal Revenue Service has ruled that a cash basis farmer who contracted to deliver wheat in one year but was not to be paid until the following year "did not have an unqualified right" to receive

payment in the year of delivery. Rev. Rul. 58–162, 1958–1 Cum.Bull. 234. However, it would assuredly have been within his "volition" to sell his right to the payment and realize income in the year of delivery.

It is clear that Patterson had it within his "volition" to take steps to obtain one-half the estimated contractual payments at the time of harvest and another one-fourth on December 31, 1969. It is equally clear that the Company had the option of delaying its acceptance of delivery of the potatoes well into the following year, so that a condition precedent to earlier payments would have been Patterson's arranging for earlier and longer-term insurance to protect the Company, which did not accept delivery until February 19–21, 1970. Appellee argues that this obligation is not a "substantial limitation" because it was totally within the control of the taxpayer. However, we do not believe the doctrine of constructive receipt extends so far as to, in effect, force such a monetary commitment with an unrelated third party (the insurance company) upon the taxpayer. This is particularly true when there is no evidence that the agreements between Patterson and J. R. Simplot Company constituted a mere tax avoidance scheme or were other than arms-length and bona fide.

Accordingly, we hold that payment of the $18,000 in 1969 was not subject to Patterson's "unfettered command and control" and was not "available to the taxpayer without [substantial] restriction or limitation." Bennett v. United States, 293 F.2d 323 (9th Cir. 1961).[1]

The decision of the Tax Court is reversed.

---

1. The parties have argued the issue of whether the $18,000 payment, being based on an estimate, was "indeterminate" and, therefore, not within the doctrine of constructive receipt. See 2 Mertens, Law of Federal Income Taxation (1967 Rev.Ed.) § 10.04. However, this issue need not be reached in view of our holding.