ESTATE OF JACQUELINE E. SHELTON, DECEASED, DONALD C. LITTLE AND JOHNNIE MOHON, CO-EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4674–73.   Filed April 11, 1977.

---

16

*Donald C. Little* and *Arthur M. Mellott,* for the petitioner.
*Joe K. Gordon,* for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income taxes:

| Taxable year | Amount of deficiency |
|---|---|
| 1968 ..................... | $4,446.33 |
| 1969 ..................... | 8,139.57 |
| 1970 ..................... | 71,216.38 |

There are two issues for our decision: (1) Whether petitioner, the estate of a deceased, unrestricted Osage Indian, should be taxed on income from its headright shares of the Osage tribal mineral trust; and (2) whether a certain portion of the interest element of a refund of taxes paid by the estate of decedent's mother, of which decedent was the sole residuary beneficiary, is includable in petitioner's gross income pursuant to sections 61 and 451.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Jacqueline E. Shelton (decedent) died on May 17, 1967, a resident of Wyandotte County, Kans. Donald C. Little (Little) and Johnnie Mohon (Mohon) qualified as coexecutors of

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

decedent's estate in the domiciliary probate proceedings in Kansas and ancillary proceedings in Oklahoma and Colorado. At the time of filing the petition herein, Little was a resident of Wyandotte County, Kans., and Mohon was a resident of Pawhuska, Okla. Little and Mohon filed U. S. Fiduciary Income Tax Returns (Form 1041) on behalf of petitioner for the taxable years 1968, 1969, and 1970 with the Internal Revenue Service Center, Austin, Tex.

## Issue 1

Decedent was the daughter of Mary Jacqueline Elkins (Elkins) who died testate on June 8, 1932. Elkins died a restricted Indian of the Osage tribe because she had never received a certificate of competency.

As of the date of her death, decedent owned 10.77837 shares in the Osage tribal mineral trust (headrights). Decedent had inherited 8.5 Osage headrights from her mother and she purchased an additional 2.27837 Osage headrights through the Osage Indian Agency (agency) at Pawhuska, Okla.

Decedent was an unrestricted Osage Indian at the time of her death because she had received a certificate of competency on September 29, 1950.

Under the Osage tribal mineral trust, the agency receives the gross mineral royalties from leases of the tribe's mineral interests, deducts administrative expenses for management purposes and for operation of the Osage Tribal Council, and then divides the balance according to the various headright interests. Unrestricted Osage Indians receive the full amount allocated to their account on a quarterly basis since the agency has no authority to withhold any part of a quarterly headright payment from an unrestricted Osage Indian. Under certain circumstances, the agency can revoke a certificate of competency.

No Osage, whether restricted or unrestricted, may sell his headright, but any Osage may by will devise his headrights to a non-Indian whether or not related by blood, marriage, or adoption, and an Osage may purchase headright shares from a non-Osage who has inherited such shares.

During the taxable years 1968, 1969, and 1970, the agency reported to the coexecutors that headright income had been paid to petitioner in the following amounts:

| | |
|---|---|
| 1968 ........................... | $23,180.34 |
| 1969 ........................... | 22,755.48 |
| 1970 ........................... | 20,080.39 |

On the Federal income tax returns which the coexecutors filed on behalf of petitioner for the taxable years 1968 and 1969, they included, in gross income, the headright income received in those years. On November 19, 1970, however, the coexecutors filed a refund claim (Form 843) requesting the repayment of all income taxes paid on behalf of petitioner for the taxable year 1968 on the theory that the headright income which they had included in gross income for 1968 was not taxable. Petitioner's 1968 taxes were refunded with interest on February 17, 1971, and mailed directly to the Kansas domiciliary coexecutors. On May 20, 1971, the coexecutors filed an amended Federal income tax return on behalf of petitioner for the taxable year 1969. Such amended return for 1969, as well as the return filed for the taxable year 1970, did not include headright income in petitioner's gross income for those years.[2] In his statutory notice, respondent included such headright income in gross income for the years in question.

## Issue 2

The superintendent of the agency and the executor of the estate of Mary Jacqueline Elkins, deceased (Elkins estate), filed a Federal estate tax return on which an assessment of $75,638.85 was made in April 1936.

In 1943, the United States Tax Court entered a stipulated decision that the total estate tax liability of the Elkins estate was $63,563.38 of which $330.19 had been paid, resulting in a deficiency of $63,233.19.

---

[2] Even though the original 1969 return had included headright income in petitioner's gross income, the original return also included deductions that were not claimed on the amended 1969 return so that both petitioner's original and amended 1969 returns showed that it owed no tax for 1969. In this proceeding, petitioner does not claim that it is entitled to the deductions which were taken on the original 1969 return but omitted on the 1969 amended return.

In March 1943, the superintendent of the agency paid under protest $69,408.82. Of such amount, $63,233.19 represented payment of the additional tax and $6,175.63 represented payment of interest thereon.

In 1969, there was a change in the position of the Internal Revenue Service (Service) regarding the Federal estate taxation of restricted Osage Indians and the Service announced that it would accept refund claims from those estates of restricted Indians which were affected by such change of position, regardless of when the Indians had died or when the estate tax returns for their estate had been filed. In September 1969, the agency filed a claim for refund of the estate tax paid on behalf of the Elkins estate.

In January 1970, the Internal Revenue Service paid $150,241.96 to the agency as a refund of Federal estate taxes paid on behalf of the Elkins estate. Of such amount, $57,663.54 was allocated to principal and $92,578.42 to interest. The full amount of such refund was credited by the agency to the Elkins estate's account on January 12, 1970. Decedent was the sole residuary beneficiary under the will of Elkins, her mother. In a letter dated March 17, 1970, the superintendent of the agency advised petitioner's coexecutors that, upon receipt of an additional coexecutors' bond, the agency would disburse the Elkins estate's tax refund to them as coexecutors of decedent's Oklahoma ancillary probate estate. Little protested payment of the refund through the Oklahoma probate proceeding and asserted that it should be paid through the Kansas domiciliary proceeding.

On August 29, 1969, the law firms of Wilkinson, Cragun & Barker (Wilkinson) and Files & Mahan (Files) applied to the Secretary of the Interior for payment of legal fees for services rendered in obtaining Federal estate tax refunds paid to Osage Indians, including the refund to the Elkins estate, even though some of the beneficiaries of such refunds, such as petitioner, had not entered into contracts with these firms. The Secretary rejected the claims of the Wilkinson and Files firms and these firms subsequently informed the Secretary that they intended to seek a judicial determination of their entitlement to such fees.

Pending the outcome of such suit, the superintendent of the agency withheld 20 percent of the Elkins estate's tax refund.

On August 13, 1974, pursuant to the judgment entered in the suit brought by Wilkinson and Files, the agency paid to these firms $378,457.72. The Elkins estate was charged $30,048.39 of this amount allocated to principal and $9,699.52 allocated to interest.

A certified copy of the additional coexecutors' bond, which the agency required prior to payment of the refund to petitioner's coexecutors, was mailed to the agency in May 1974. It is stipulated that on October 10, 1974, a check in the amount of $160,713.50,[3] representing the funds held by the agency arising out of the Elkins estate's tax refund, was issued to Little and Mohon as petitioner's Kansas coexecutors, pursuant to the November 27, 1973, order of the District Court of Osage County, Okla.

In his statutory notice, respondent increased petitioner's taxable income for 1970 by $92,578.42, as representing the taxable interest element of the Elkins estate's tax refund which petitioner had not reported, on the theory that petitioner constructively received such refund in 1970. However, respondent concedes in his brief that the ratable portion of the refund allocable to interest (which was withheld by the agency pending judgment in the Wilkinson and Files suit) was not constructively received and reduces his prayer the requisite amount. Respondent computes this reduction as being $18,509.81, but we find the proper figure to be $18,515.68.

OPINION

*Issue 1*

Petitioner contends that the income which it received from Osage headright shares during the taxable years 1968, 1969, and 1970[4] is not properly includable in its gross income pursuant to section 61.[5] Petitioner asserts that the Osage

---

[3] The large difference between this stipulated amount and the 1970 payment from IRS to the agency is not explained.

[4] Petitioner argues in its brief that it is entitled to Federal income tax refunds for the taxable years 1959 and 1961 through 1967. However, we have no jurisdiction to determine the validity of such claims since respondent has not issued notices of deficiency for those years. Sec. 6214(b), I.R.C. 1954.

[5] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross

Allotment Act of June 28, 1906, ch. 3572, 34 Stat. 539 (hereinafter Osage Allotment Act), as in effect during the years in issue,[6] exempts petitioner's headright income from the Federal income tax. We disagree.

It is fundamental that Indians are citizens and are liable for the payment of Federal income taxes unless applicable treaties or remedial legislation provide an exemption. *Squire v. Capoeman,* 351 U.S. 1 (1956). While the general rule requires tax exemptions to be clearly expressed, statutes affecting Indians are liberally construed, with all doubtful expressions resolved in their favor. *Squire v. Capoeman, supra; Big Eagle v. United States,* 300 F.2d 765. (Ct. Cl. 1962).

Prior to the passage of the Osage Allotment Act,[7] the Osage reservation, consisting of approximately 1½ million acres of land with underlying valuable minerals, was held by the United States in trust for the Osage tribe. The Osage Allotment Act was designed to gradually emancipate the Osages. *Big Eagle v. United States, supra* at 768. Section 2 of this Act allowed each Osage to select three 160-acre tracts and the land remaining after such selection process was concluded was to be divided equally among the tribal members. Each

---

income means all income from whatever source derived, including (but not limited to) the following items:

* * *

(15) Income from an interest in an estate or trust.

[6] The Osage Allotment Act of June 28, 1906, ch. 3572, 34 Stat. 539, has been amended and supplemented as follows:

Act of Apr. 18, 1912, ch. 83, 37 Stat. 86;
Act of Jan. 18, 1917, ch. 16, 39 Stat. 867;
Act of May 25, 1918, ch. 86, sec. 17, 40 Stat. 561, 578–579;
Act of Mar. 3, 1921, ch. 120, 41 Stat. 1249;
Act of Apr. 12, 1924, ch. 95, 43 Stat. 94;
Act of Feb. 27, 1925, ch. 359, 43 Stat. 1008;
Act of Mar. 2, 1929, ch. 493, 45 Stat. 1478;
Act of June 24, 1938, ch. 645, 52 Stat. 1034;
Act of Aug. 4, 1947, ch. 474, 61 Stat. 747;
Act of Feb. 5, 1948, ch. 46, 62 Stat. 18;
Act of June 15, 1950, ch. 248, 64 Stat. 215;
Act of Sept. 1, 1950, ch. 832, 64 Stat. 572;
Act of Aug. 28, 1957, Pub. L. 85–192, 71 Stat. 471;
Act of Oct. 6, 1964, Pub. L. 88–632, 78 Stat. 1008.

[7] See *Big Eagle v. United States,* 300 F.2d 765 (Ct. Cl. 1962), and U. S. Department of the Interior, Federal Indian Law 1030–1049 (1958), for a more detailed discussion of the background history and of the provisions of the Osage Allotment Act and the amendments to it.

member was allowed to designate one of the three 160-acre tracts as a "homestead" to be "inalienable and nontaxable until otherwise provided by Act of Congress." 34 Stat. 541. The remaining land allotted to each Osage was known as "surplus" land which was to be inalienable for 25 years and nontaxable for 3 years except that it would become taxable earlier upon the issuance of a certificate of competency or upon the death of the allottee. Section 3 of the Osage Allotment Act reserved the minerals underlying all of the lands to the Osage tribe for a period of 25 years (since extended indefinitely, Act of Oct. 6, 1964, Pub. L. 88–632, 78 Stat. 1008), at the end of which the minerals underlying the allotted lands will become the property of the individual owner of such land. Section 4 of the Osage Allotment Act provided that the royalties from leases of the mineral interests be placed in trust by the United States for the Osages and each tribal member was granted a 1/2,229th share, or headright, of the distributable income from the minerals. Such mineral trust was extended to January 1, 1984, by the Act of June 24, 1938, ch. 645, 52 Stat. 1034 (hereinafter 1938 amendment). Section 4 of the Osage Allotment Act also provided that such mineral royalties, and certain other trust income, should be allocated on a pro rata basis and paid quarterly to the headright owners except in the case of minors. However, this provision was subsequently modified so that the Secretary of the Interior was given authority to withhold a portion of such quarterly payments to those tribe members who had not received a certificate of competency, but the Secretary was not authorized to withhold any portion of those payments due to unrestricted Osages. Act of Feb. 27, 1925, ch. 359, 43 Stat. 1008 (hereinafter 1925 amendment).

Paragraph 7 of section 2 of the Osage Allotment Act provided for the issuance of certificates of competency which authorized the holder to alienate any of the lands deeded to him under the Act, except for the homestead, which remained inalienable for a limited period, and the mineral interests. Subsequently, the Act of Feb. 5, 1948, ch. 46, 62 Stat. 18 (hereinafter 1948 amendment), provided that all restrictions against alienation of property, except headright shares or

interests in the Osage tribal mineral estate, were removed upon receipt of a certificate of competency.

After carefully examining the Osage Allotment Act and the amendments to it, we have concluded that the Act, even when liberally construed in favor of petitioner, does not exempt the headright income of an unrestricted Osage Indian from Federal income taxation.

In *Choteau v. Burnet*, 283 U.S. 691 (1931), the Supreme Court of the United States held that the headright income of an unrestricted Osage Indian was taxable. Respondent argues that the rationale of *Choteau* applies, while petitioner argues that it does not in light of the subsequent amendments to the Osage Allotment Act as well as the subsequent decisions in *Squire v. Capoeman, supra,* and *Big Eagle v. United States, supra.*

In *Choteau,* the Supreme Court stated (283 U.S. at 695–696):

The petitioner, then, was competent to hold and make any use (except to grant mining leases) of all his lands. All except his homestead were taxable, and were freely alienable without control or supervision of the government. *His share of the royalties from oil and gas leases was payable to him without restriction upon his use of the funds so paid.* It is evident that as respects his property other than his homestead his status is not different from that of any citizen of the United States. In the process of gradually changing the relation between the Indian and the government he has been, with respect to the income in question, fully emancipated. * * * It is true, as petitioner asserts, that as to his homestead he still remains a restricted Indian. But this fact is only significant as evidencing the contrast between his qualified power of disposition of that property and his *untrammeled ownership of the income in controversy.* The latter was clearly beyond the control of the United States. The duty to pay it into petitioner's hands, and his power to use it after it was so paid, were absolute. * * * [Emphasis supplied.]

None of the amendments to the Osage Allotment Act have placed any restrictions whatsoever on the use of the income received by an unrestricted Osage Indian from his headright shares.[8] In fact, Congress reaffirmed an unrestricted Osage Indian's "untrammeled ownership" of the headright income by passing the 1925 amendment which provided "that the Secretary of the Interior *shall* cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe of

---

[8] Sec. 4 of the Act of Feb. 27, 1925, ch. 359, 43 Stat. 1008, 1010, authorizes the Secretary of the Interior to revoke certificates of competency in limited circumstances. However, such revocation would not restrict petitioner's ownership of funds that have already been distributed so that it has no bearing upon the instant case. *Choteau v. Burnet,* 283 U.S. 691, 695 (1931).

Indians in Oklahoma having a certificate of competency, his or her pro rata share" of the trust income. (Emphasis supplied.)

While petitioner relies heavily on the fact that decedent could not sell her headrights, we do not believe that restrictions on alienation of the *headrights* dictate nontaxability of headright *income*. In *Choteau,* the Court stressed Choteau's "untrammeled ownership" of the income, not the underlying headrights. Moreover, "Nontaxability and restriction upon alienation are distinct things." *Superintendent of Five Civilized Tribes v. Commissioner,* 295 U.S. 418, 421 (1935). *This distinction is demonstrated in the Osage Allotment Act itself which provides that the "surplus" lands be inalienable for 25 years, but nontaxable for only 3 years.*

Petitioner's reliance on *Squire v. Capoeman, supra,* and *Big Eagle v. United States, supra,* is misplaced. In *Squire,* the Supreme Court of the United States held income received by a restricted Quinaielt Indian from the sale by the United States Government of standing timber on allotted lands was exempt from Federal income taxation pursuant to the Quinaielt Treaty, the trust patent, and the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C., sec. 331 et seq. (hereinafter General Allotment Act). The courts below had held that imposition of a tax on income derived directly from the restricted lands would be inconsistent with the statutory provision of the General Allotment Act requiring the Government to transfer the fee to such lands "free of all charge or incumbrance whatsoever" at the end of the trust period. Although the Supreme Court agreed that "the general words 'charge or incumbrance' might well be sufficient to include taxation" (351 U.S. at 7), it found that an amendment to the General Allotment Act gave additional force to the argument for nontaxability, since it implied that the allotment should be free of all taxes until a patent in fee was issued.

In *Big Eagle v, United States, supra,* the United States Court of Claims held that the headright income of a *restricted* Osage Indian was tax exempt pursuant to the Osage Allotment Act. The court implied such exemption from the Act of Mar. 2, 1929, ch. 493, sec. 1, 45 Stat. 1478, 1479

(hereinafter 1929 amendment), as well as section 3 of the 1938 amendment, both of which state—

all royalties and bonuses arising therefrom shall belong to the Osage Tribe of Indians, and shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law. * * *

The court reasoned (300 F.2d at 771) that this language obligated the United States—

to transfer at the end of the trust *or declaration of competency,* the lands and cash received for oil and gas undiminished by any deductions levied thereon by the guardian or trustee. If the General Allotment Act implied nontaxability when it directed that trust property be turned over to the Indian after the trust period free of ALL charges, etc., certainly the implication is just the same in the Osage Allotment Act decreeing that ALL royalties and bonuses shall be turned over. If Federal income taxes are first withheld, ALL will not be turned over to the plaintiffs. [Emphasis supplied.]

Both *Squire* and *Big Eagle* dealt with restricted Indians while decedent was unrestricted. Both cases reasoned that taxation of the income in question would conflict with "the purpose of bringing [the Indian] finally to a state of competency and independence" and would "limit or undermine the Government's undertaking." *Squire v. Capoeman,* 351 U.S. at 10. Since decedent in the instant case had been declared competent before her death, the Government's undertaking was successfully concluded so that taxation of petitioner's headright income would no longer undermine such undertaking. It follows that the rationale of *Squire* and *Big Eagle* does not apply to the instant case.

Accordingly, we hold that the rationale of *Choteau v. Burnet, supra,* applies,[9] so that the headright income received by petitioner during the years in question is taxable.

---

[9] Petitioner asserts that *Choteau v. Burnet, supra,* is inapplicable because the certificate of competency was issued to decedent, not petitioner, and therefore, should have no effect on the taxability of headright income paid to petitioner. We find this argument unpersuasive because such certificate *did* affect petitioner's ownership of the headright income. The Act of Mar. 2, 1929, ch. 493, sec. 4, 45 Stat. 1478, 1480, states:

"Upon the death of any Osage Indian of less than one-half of Osage Indian blood or upon the death of an Osage Indian who has a certificate of competency, his moneys and funds and other property accrued and accruing to his credit shall be paid and delivered to the administrator or executor of his estate to be administered upon according to the laws of the State of Oklahoma * * *" .

Therefore, the certificate of competency gave petitioner, as well as decedent, "untrammeled ownership" of the headright income.

## Issue 2

Petitioner presents three theories in support of its position that the entire interest element[10] of the Elkins estate's tax refund is not includable in its gross income for the taxable year 1970. Petitioner argues (1) that if the refund generated any 1970 taxable income, such income is taxable to the Elkins estate rather than petitioner, (2) that all of the refund is excluded from petitioner's gross income as a bequest pursuant to section 102, and (3) that the refund was not constructively received by petitioner during 1970 so that no part of it is includable in gross income for that year under section 451.

Section 641 provides:

SEC. 641. IMPOSITION OF TAX.

(a) APPLICATION OF TAX.—The tax imposed by section 1(d) shall apply to the taxable income of estates or of any kind of property held in trust, including—

\* \* \*

(3) income received by estates of deceased persons during the period of administration or settlement of the estate \* \* \*

The applicable Income Tax Regulations provide:

Sec. 1.641(b)-3. Termination of estates and trusts.

(a) The income of an estate of a deceased person is that which is received by the estate during the period of administration or settlement. The period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies, and bequests, whether the period required is longer or shorter than the period specified under the applicable local law for the settlement of estates. \* \* \* However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration. Further, an estate will be considered as terminated when all the assets have been distributed except for a reasonable amount which is set aside in good faith for the payment of unascertained or contingent liabilities and expenses (not including a claim by a beneficiary in the capacity of beneficiary).

\* \* \*

---

[10] In his brief respondent concedes that a ratable portion of this interest (attributable to the amount contingently withheld) should not be included in petitioner's gross income for the taxable year 1970. Respondent computed this amount to be $18,509.81 but the correct figure is $18,515.68.

(d) If a trust or the administration or settlement of an estate is considered terminated under this section for Federal income tax purposes (as for instance, because administration has been unduly prolonged), the gross income, deductions, and credits of the estate or trust are, subsequent to the termination, considered the gross income, deductions, and credits of the person or persons succeeding to the property of the estate or trust.

Therefore, any 1970 income generated by the Elkins estate's tax refund will be includable in the gross income of petitioner, as a successor to the property of the Elkins estate, *unless the refund was received by the Elkins estate during the period of administration.* Moreover, petitioner has the burden of proving that the Elkins estate had not been terminated prior to the receipt of the refund. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner has not met this burden. There is no evidence before us to indicate that the estate was not terminated before 1970. Accordingly, we hold that the 1970 taxable income arising from the refund, if any, is taxable to petitioner, rather than the Elkins estate.

Moreover, the interest element of the refund is taxable to petitioner. Interest is included in gross income under section 61(a)(4),[11] and the section 102[12] exclusion does not apply to the income from any property acquired by bequest. Sec. 102(b)(1). Accordingly, we hold that the interest element of the Elkins estate's tax refund is includable in petitioner's gross income so that it is now necessary to determine if 1970 is the proper year of inclusion.

In a letter to coexecutor Little, dated March 17, 1970, the superintendent of the Osage Indian Agency stated:

*Upon receipt of an additional coexecutors' bond in the amount of $150,000, or in the amount determined by the court, this office will disburse said*

---

[11] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this ·subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

    * * *

    (4) Interest;

[12] SEC. 102. GIFTS AND INHERITANCES.

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

(b) INCOME.—Subsection (a) shall not exclude from gross income—

    (1) the income from any property referred to in subsection (a) * * *

Federal estate tax refund to you and Miss Mohon *as coexecutors of the Oklahoma probate.* [Emphasis supplied.]

However, the proceeds were not disbursed to petitioner during 1970. The required bond was not submitted until 1974 and the coexecutors protested the disbursement of the refund to them as the coexecutors of the Oklahoma probate estate.

Section 451(a)[13] sets forth the general rule that an item of gross income is includable for the taxable year in which it is "received." Section 1.451–2(a), Income Tax Regs., states:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Petitioner argues that the estate tax refund was not "credited to his account, set apart for him, or otherwise made available" during 1970 because the refund was credited to the Elkins estate's account on the agency books, not decedent's or petitioner's account. Petitioner further argues that control of its receipt was subject to "substantial limitations or restrictions," since the agency would not release the refund to petitioner's representatives without the posting of an additional coexecutors' bond and the refund would only be released to the petitioner's representatives as coexecutors of the Oklahoma ancillary estate rather than the Kansas domiciliary estate.

The refund was "set apart for [petitioner] or otherwise made available" to it during 1970, even though the refund was not actually credited to petitioner's account at the agency. It was credited to the account of the Elkins estate of which decedent (and consequently petitioner) was the sole residuary beneficiary. Petitioner has introduced no evidence whatsoever to show that these funds were not part of the

---

[13] SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Petitioner has not argued that the income from the refund is includable, under its accounting method, in a year other than the year of receipt, nor has it introduced any evidence to support such an argument.

residue of the Eklins estate or that any other party had an interest in the Elkins estate. Of course, in 1974 petitioner did actually receive the funds credited to the Elkins estate's account. The superintendent's March 17, 1970, letter supports our conclusion that the refund was made available to petitioner in 1970 by stating that the refund would be distributed to petitioner's Oklahoma coexecutors upon receipt of the required bond. Petitioner has failed to meet its burden of proving that the refund, less the amount being withheld, was not "made available so that [petitioner could] draw upon it at any time" when it was credited to the account of Elkins estate on the agency books. Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner has also failed to meet its burden of proving that the bond requirement is a substantial limitation or restriction upon its control of the receipt of the refund. Petitioner has introduced no evidence that the coexecutors could not obtain the necessary bond *whenever* they chose. Therefore, we must conclude that the time at which the bond requirement would be satisfied was within petitioner's complete control.[14] Accordingly, we hold that the bond requirement is not a substantial limitation or restriction on petitioner's control of the receipt of the refund.

Finally, requiring petitioner's representatives to receive payment on behalf of the Oklahoma ancillary estate is not a substantial restriction or limitation. It has been held that there is no constructive receipt of income where one must surrender a valuable right to realize it. *Cohen v. Commissioner,* 39 T.C. 1055 (1963); *Griffith v. Commissioner,* 35 T.C. 882 (1961). However, petitioner's representatives would have

---

[14] We realize that in *Patterson v. Commissioner,* 510 F.2d 48, 51 (9th Cir. 1975), the court said:

"Appellee argues that this obligation is not a 'substantial limitation' because it was totally within the control of the taxpayer. However, we do not believe the doctrine of constructive receipt extends so far as to, in effect, force such a monetary commitment with an unrelated third party (the insurance company) upon the taxpayer. * * *"

However, in *Patterson,* the monetary obligation would have been *greater* if the taxpayer had demanded payment in an *earlier* year than the one in which the income was actually received. Therefore, *Patterson* is distinguishable because we have no evidence before us in the instant case indicating that the cost of the bond would have been greater in 1970 than in any subsequent year including 1974 when the bond was actually obtained.

forfeited no rights by accepting the refund on behalf of the Oklahoma ancillary estate because they had no legal right to receive the refund on behalf of the Kansas domiciliary estate. The Act of Apr. 18, 1912, ch. 83, sec. 3, 37 Stat. 86, provides that the property of deceased Osage allottees shall be subject to the jurisdiction of the county courts of Oklahoma in probate matters. *Globe Indemnity Co. v. Bruce*, 81 F.2d 143, 150 (10th Cir. 1935). The Act of Mar. 2, 1929, ch. 493, sec. 3, 45 Stat. 1478, 1480, extends the jurisdiction of the Oklahoma probate courts to unrestricted Osage Indians in the case of "his money and funds and other property accrued and accruing to his credit" in the agency accounts. Since petitioner's representatives did not have to forfeit a valuable right in order to receive the refund on behalf of the Oklahoma ancillary estate, the requirement that the refund be received on behalf of the ancillary estate was not a substantial limitation or restriction on petitioner's control of the receipt of the refund. Accordingly, since the estate tax refund, less the amount withheld, was made available to petitioner without any substantial restrictions or limitations on its control of the receipt of such part of the refund,[15] we hold that such part of the refund was constructively received in 1970 and that petitioner's 1970 gross income should include the interest element of the refund, less the amount of the withheld funds attributable to such interest element as conceded by respondent.

*Decision will be entered under Rule 155.*

---

[15] In its brief, petitioner argues that its lack of control over receipt of the refund is demonstrated by the fact that even though the Oklahoma court ordered the agency to disburse the refund to the Kansas coexecutors in November 1973, and the required bond was submitted in May 1974, the agency did not disburse any part of the refund until October 1974. (Petitioner's Brief, p. 101.)

While we sympathize with petitioner, this argument is unpersuasive. The agency was at all times liable to petitioner for payment of the refund. In *United States v. Hancock Bank*, 400 F.2d 975 (5th Cir. 1968), the Fifth Circuit Court of Appeals held that an item of gross income had been constructively received, stating (400 F.2d at 979):

"Although [the payor] undoubtedly placed an obstacle in the trustee's path to receiving the funds by placing them in a suspense account, the obstacle was wholly without legal basis."